Slip Op. 15 - 93

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JUANCHENG KANGTAI CHEMICAL CO., LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| ARCH CHEMICALS, INC., a LONZA COMPANY, ARCH CHEMICALS (CHINA) CO., LTD., AND HEBEI JIHENG CHEMICAL CO., LTD., | : |
| | : |
| Consolidated Plaintiffs, | : |
| | : |
| v. | : Before:  R. Kenton Musgrave, Senior Judge |
| | : |
| UNITED STATES, | : Consol. Court No. 14-00056 |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| CLEARON CORP, OCCIDENTAL CHEMICAL CORPORATION, | : |
| | : |
| Defendant-Intervenors. | : |

## OPINION

[Remanding seventh (2011-2012) administrative review of chlorinated isocyanurates from the People's Republic of China for further proceedings.]

Dated:  August 21, 2015

*Gregory S. Menegaz*, *J. Kevin Horgan*, and *John J. Kenkel*, deKieffer & Horgan, PLLC, of Washington DC, for the plaintiff.

*Peggy A. Clarke*, Law Offices of Peggy A. Clarke, of Washington DC, for the consolidated plaintiffs.

*Jane C. Dempsey*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant.  On the brief were *Joyce R. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of Counsel was *David Richardson*, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*James R. Cannon, Jr.*, *Vanessa P. Sciarra*, and *Ulrika K. Swanson*, Cassidy Levy Kent (USA) LLP, of Washington DC, for the defendant-intervenors.

Musgrave, Senior Judge:  This opinion addresses consolidated challenges to aspects of *Chlorinated Isocyanurates From the People's Republic of China* ("PRC"), 79 Fed. Reg. 4875 (Jan. 30, 2014), and accompanying issues and decision memorandum (Jan. 23, 2014) ("*IDM*"), Public Record Document ("PDoc") 200, (together, "*Final Results*").  The proceeding is the seventh administrative review of the antidumping duty ("AD") order on chlorinated isocyanurates ("chlor-isos")[1] from the PRC conducted by the International Trade Administration of the U.S. Department of Commerce ("Commerce").  The period of review is June 1, 2011, through May 31, 2012, and the administrative analysis embodied in the *IDM* sets forth Commerce's determinations regarding the plaintiff Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") and the consolidated plaintiffs Hebei Jiheng Chemical Co., Ltd. ("Jiheng") and Arch Chemicals (China) Co., Ltd. (together, "Arch"), all producers and/or exporters of the subject merchandise from the PRC and respondents in the administrative review.

Kangtai and Arch have filed separate motions for summary judgment on the agency record pursuant to USCIT Rule 56.2.  Each separately or together challenges: the selection of the

---

[1]   The subject merchandise are all forms of chlor-isos, which are derivatives of cyanuric acid.  The three primary compositions are trichloroisocyanuric acid, sodium dichloroisocyanurate, and sodium dichloroisocyanurate, all in powder, granular, and tableted forms.  *IDM* at 2.

Philippines as the primary surrogate country for valuing factors of production over those for (A) India and (B) Thailand; (C) the use of the financial statement from the Philippine company Mabuhay Vinyl Corporation ("MVC") to calculate the surrogate financial ratios; (D) the determination to treat retirement and employee benefits as selling, general and administrative ("SG&A") expenses rather than labor expenses and not to adjust the surrogate financial ratios for retirement benefits for International Labor Organization (ILO) Chapter 6A data; the valuation of (E) chlorine, (F) ammonium chloride, (G) sodium hydroxide, (H) electricity, and (I) steam; (J) treatment of Kangtai's and Arch's by-product adjustment claims regarding ammonium sulfate; and finally (K) the deduction of 8% from net U.S. price for the PRC's value added tax ("VAT") that is not actually, plaintiffs contend, collected upon export, concerning which issue Commerce has requested voluntary remand, which Kangtai and Arch oppose without the court first deciding the issue of law upon which the adjustment is predicated.

For the reasons below, remand is ordered as follows.

## I. *Background*

Commerce initiated the seventh administrative review of the antidumping duty order covering chlor-isos from the PRC in July 2012. *Initiation of Antidumping and Countervailing Duty Administrative Reviews, Requests for Revocations in Part*, 77 Fed. Reg. 45338 (July 31, 2012). Selecting Kangtai and Jiheng as mandatory respondents, Commerce sent questionnaires to those companies. Respondent Selection Memoranda , PDoc 29 (Sep. 17, 2012); Commerce Questionnaire, PDocs 30 & 31 (Sep. 19, 2012) . Commerce's Office of Policy's list of potential surrogate countries was provided to the parties on or around February 7, 2013:

*Per Capita* GNI,

| Country | 2009 (US$) |
|---|---|
| PRC | 4,940 |
| Philippines | 2,210 |
| Indonesia | 2,940 |
| Thailand | 4,420 |
| Columbia | 6,110 |
| South Africa | 6,960 |
| Costa Rica | 7,660 |

Letter from Commerce *re* Surrogate Country Memorandum, PDoc 80 (Feb. 7, 2013) ("OP List").

Commerce published its preliminary review results in July 2013. *Chlor-Isos From the PRC*, 78 Fed.

Reg. 41364 (July 10, 2013) (prelim. admin. review) ("*Preliminary Results*").  Interested parties

submitted administrative case briefs in November 2013, PDocs 180-84 & 186, and the parties

submitted administrative rebuttal briefs in December 2013.  PDocs 187, 190, 192.  Commerce issued

the *Final Results* in January 2014.

## II.  *Jurisdiction and Standard of Review*

        The action is brought pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. §1516a(a)(2)(B)(iii).  Kangtai and Arch have standing under 19 U.S.C.

§1516a(d) and 28 U.S.C. §2631(c).

        The party challenging a final administrative determination of the type at bar is

burdened with showing how it is "unsupported by substantial evidence on the record" or is not

"otherwise in accordance with law."  19 U.S.C. §1516a(b)(1)(B)(i).  *See, e.g.*, *NSK Ltd. v. United*

*States*, 481 F.3d 1355, 1359 (Fed. Cir. 2007), citing 19 U.S.C. §1516a(b)(1)(B)(i)); *see also United*

*States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  Substantial evidence means "more than a mere

scintilla", it must be "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) ("*Universal*

*Camera*"), citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Commerce's statutory

interpretations are considered pursuant to the familiar two-step analysis set forth in *Chevron U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) (if "Congress has

directly spoken to the precise question at issue . . ." *et cetera*) ("*Chevron*").

III.  <em>Discussion</em>

<em>A</em>.  Primary Surrogate Country Selection; India's Non-consideration

1.  Further Background

Commerce generally calculates the normal value ("NV") of subject merchandise from

a non-market economy ("NME") country based on the "best available information" from an

appropriate market economy country "or countries" for valuing the factors of production, or

"FOPs"[2], used to manufacture the merchandise.[3]  19 U.S.C. §1677b(c)(1).  In that valuation,

Commerce is required to utilize, to the extent possible, the prices or costs of FOPs in one or more

market economy countries that are "at a level" of economic development comparable to that of the

nonmarket economy country as well as "significant producers" of comparable merchandise.  19

U.S.C. §1677b(c)(4).

Commerce considers the statute ambiguous as to the meaning of the terms employed.

In providing that it may be necessary to derive the "best available information" for the valuation of

---

[2] FOPs include labor, raw materials, energy and other consumed utilities, "representative" capital cost including depreciation, plus general expenses, profit, and the cost of containers, coverings, and other expenses.  19 U.S.C. §1677b(c)(1) & (3).

[3] If "the available information is inadequate" for that purpose, Commerce is instructed to determine NV on the basis of merchandise from "one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy", which merchandise must be "comparable" to the subject merchandise.  19 U.S.C. §1677b(c)(2).

FOPs from "one or more" such countries, Commerce construes this as congressional indifference on whether FOPs are valued from a single market economy country as opposed to multiple countries, and therefore Commerce interprets the statute to permit valuation of FOPs based on the following hierarchy:

> (1) prices paid by the NME manufacturer for items imported from a market economy;
>
> (2) prices in the primary surrogate country of domestically produced or imported materials;
>
> (3) prices in one or more secondary surrogate countries reported by the industry producing subject merchandise in the secondary country or countries; and
>
> (4) prices in one or more secondary surrogate countries from sources other than the industry producing the subject merchandise.

*E.g.*, *Sparklers From the PRC*, 56 Fed. Reg. 20588, 20590 (May 6, 1991) (final less than fair value ("LTFV") determination). "This ranking of data sources reflects the Department's desire to use to the greatest extent possible factor prices in a single surrogate country." *Id*. *Cf*. 19 C.F.R. §351.408(c)(2) (except for labor Commerce "normally" will value all factors in a single surrogate country).

There is nothing inherently unreasonable in desiring, foremost, to value all FOPs from a single country, and Commerce's interpretation is entitled to deference in proportion to its reasonableness.  Commerce's interpretation has evolved from practice.  In proposing codification thereof, *see* 19 C.F.R. §351.408(c), Commerce received no comments on the issue of surrogate country selection.  *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27365 (May 19, 1997).  Commerce explained that valuing all FOPs from a single source country attempts to curtail "margin shopping," *i.e.*, combining input prices from different surrogates to achieve the

highest or lowest valuations of inputs.  *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg.

7308, 7345 (Feb. 27, 1996) (proposed rules).

It also encountered, to the contrary, "situations in which the accuracy of available

information regarding prices for particular factors in the surrogate country is highly questionable"

whereby it is "appropriate to reject the questionable values and use data from a second country."

*Id*.  Commerce did not explain why, in such a situation, a country with "highly questionable" data

should even be considered in the selection of a "primary" surrogate in the first place, but be that as

it may, there may be situations in which the pursuit of the administrative preference for valuing

FOPs from a single surrogate country runs into conflict with what is the "best available

information", to the point of relegating the statutory term "one *or more* market economy countries"

to secondary (and therefore unreasonable) status in proportion to the extent to which data quality

is ignored in that pursuit.

Of particular importance to this matter, as in the previous review, is the silence of 19

U.S.C. §1677b(c) regarding how Commerce may determine that a country is economically

"comparable" to the non-market economy ("NME") country.  Commerce states that its "long

standing" practice on the consideration has been to engage in a "sequential" consideration of the

statutory elements of economic comparability, comparable merchandise, significant producer, and

data quality.  *See Import Administration Policy Bulletin 04.1: Nonmarket Economy Surrogate

Country Selection Process* (Mar. 1, 2004) (reflecting a legal standard of emphasizing surrogate data

availability and quality in the selection of the surrogate country or countries to use as sources for

the surrogate values of material inputs and other costs under the nonmarket economy methodology).

This has not been held unreasonable, but it has generated controversy.

"[A]s the measure of economic comparability", Commerce's regulation states that Commerce will place "primary emphasis" on a certain national economic indicator; its current practice places primary emphasis on gross national income ("GNI").  *See* 19 C.F.R. §351.408(b). In that consideration, Commerce's practice currently relies on generating, early in the proceeding, a list from its Office of Policy ("OP list") of those countries that are "at", in terms of a narrow band, a level of economic development similar to the NME country in question, in this instance the PRC. In accordance with its announced policy, Commerce relies for that determination upon countries' *per capita* GNI data that are available in the World Development Report published by the World Bank.[4]  Accordingly, for the matter at bar, Commerce's OP List explained to interested parties that the list of surrogate countries is "non-exhaustive" and

> provides you the countries that are economically comparable to [the PRC] and most likely to have good data availability and quality. You may also consider other countries on the case record if the record provides you adequate information to evaluate them. You may be unable to obtain the necessary factor price information in a suitable surrogate country.  If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Op List.

On March 1, 2013, the petitioners, Clearon Corporation and Occidental Chemical Corporation (together, "Clearon"), and Arch submitted their respective surrogate country

---

[4]  *See* Preliminary Decision Memorandum, PDoc 138 (July 2, 2013) ("*PDM*"), at 7, referencing *Pure Magnesium from the PRC*, 75 Fed. Reg. 80791 (Dec. 23, 2010) (final admin. rev. results) and accompanying I&D Memo at cmt. 4.  *See also Fujian Lianfu Forestry Co., Ltd. v. United States*, 33 CIT 1056, 638 F. Supp. 2d 1325 (2009) (affirming reliance upon Commerce's "flexible GNI" inquiry in the identification of potential surrogate countries where Commerce reasonably explained why Indian and the PRC were still at comparable levels of economic development at that time despite GNIs of US\$ 620 and US\$ 1,290, respectively).

comments.[5] Kangtai did not submit any comments or rebuttal comments.  On the March 15, 2013

deadline, Arch, Kangtai, and Clearon submitted substantial amounts of surrogate value data.  *See*

PDocs 92-109.  In its first surrogate value submission, Kangtai submitted surrogate value data for

India, the Philippines, and Thailand and made the following statement:

> Kangtai submits that the Department should look to India and/or the Philippines or
> Thailand for industries producing comparable products. The Department has seen fit
> in the past to use . . . surrogate values for chlorine from Indian financial statements,
> we submit Kanoria's 2010-2011 chlorine data to be used for the chlorine input in this
> review.

Kangtai Prelim. SV Submission, PDoc 108 (Mar. 15, 2013), at 1; *see also* PDoc 109.

In June 2013, Kangtai submitted a rebuttal to Clearon's pre-preliminary

determination comments in which Kangtai argued that the record shows Thailand "constitutes the

best available surrogate country" and "the most significant producer on the record" because it "has

both production and exports of comparable merchandise" and "[p]arties have provided several

financial statements of Thai producers for the record of this case, whereas only one financial

statement for a Philippine producer has been submitted."  Kangtai proceeded to argue against using

the Philippine producer's financial statement because it revealed no export activities, only domestic

market production, and that Thailand has both production and exports of comparable merchandise

as well as "contemporaneous values for all factors of production, while the Philippines does not."

Kangtai's Resp. to Prelim. Cmts, PDoc132 (June 20, 2013), at 2, referencing Jiheng SV Submission,

---

[5] *See* Arch Surrogate Country Cmts, PDoc 87 (Mar. 1, 2013); Clearon's Surrogate Country
Cmts , PDoc 86 (Mar. 1, 2013).  On March 29, 2013, Clearon submitted rebuttal comments.  *See*
Clearon's Surrogate Country Rebuttal Cmts , PDoc 117 (Mar. 29, 2013).

PDocs 105-06 (Mar 15, 2013), at Ex. 9, 10 & 11. Kangtai did not submit any other comments

regarding surrogate country selection.

As mentioned, Commerce published its preliminary determination in July 2013.

*Chlor-Isos From the PRC*, 78 Fed. Reg. 41364 (July 10, 2013) (prelim. rev. results), PDoc 150; *see*

*also PDM*.  Despite Kangtai's argument, Commerce preliminarily selected the Philippines as the

primary surrogate country. *See id.* at 7-8.  The *PDM* reiterates that because it is Commerce's policy

to consider all countries on the OP List to be "equally comparable economically" to the PRC,

Commerce did not use GNI alone as the rationale for selecting among the six countries that made

the Surrogate Country List (*i.e.*, Colombia, Costa Rica, Indonesia, the Philippines, South Africa, and

Thailand) but rather evaluated which of these countries "is also a significant producer of comparable

merchandise" (as required by statute in any event) and also "has reliable data." *Id*. at 8.

Although India had been Commerce's surrogate country selection in the investigation

and in the first through fifth administrative reviews, the relative GNI ranking of the PRC to India

and other countries changed over time.  Consequently, as in the prior administrative review covering

the 2010-2011 period ("*Sixth Review*"), for this *Seventh Review* India did not make the OP list of

potential surrogates, and, as in the *Sixth Review*,[6] Commerce selected the Philippines as the primary

---

[6]  The *Sixth Review* was remanded *per Clearon Corp. v. United States*, 38 CIT ___, Slip Op. 14-88 (July 24, 2014) ("*Clearon I*") at 34. Due to certain arguments in the briefing of this *Seventh Review*, this matter was stayed pending the results of redetermination pursuant to that decision on the *Sixth Review*.  *See* ECF No. 62 (Feb. 6, 2015).  Those results were filed *sub nom. Final Results of Redetermination Pursuant to Court Remand*, *Clearon Corporation v. United States*, *see* Court No. 13-00073, ECF No. 69 (Dec. 11, 2014) ("*Clearon Redetermination*"), and Commerce's general responses therein are herein presumed indicative of its positions on the overlapping issues. *See Clearon Corp. v. United States*, 39 CIT ___, Slip Op. 15-91 (Aug. 20, 2015) ("*Clearon II*").

surrogate country for FOP surrogate values, this time by process of elimination:[7] "because there is either no data on the record for any FOP or usable surrogate financial statements for Colombia, Costa Rica, Indonesia, South Africa, and Thailand, these countries will not be considered for primary surrogate country selection purposes at this time." *Id.* at 9-10.

This determination remained unchanged in the *Final Results*.

2.   Analysis

Kangtai argues for remand concerning Commerce's choice of primary surrogate country, repeating here a number of the points it raised on its previous appeal of the *Sixth Review*. Kangtai contends it argued for the choice of India before Commerce and that Commerce did not properly consider the data that would support the choice of India before rejecting India out of hand simply on the basis that it was not on the OP List.

Kangtai first argues that Commerce "broke established precedent" and that "principles of fairness" require Commerce to provide timely notice of the change. Kangtai's Br. at 22, referencing *Shikoku Chemicals Corporation v. United States*, 16 CIT 382, 388, 795 F. Supp. 417,

---

[7] This choice was based as well upon findings (1) that sodium hypochlorite is comparable to the subject merchandise based on similar characteristics and end uses and a similar production process (as previously determined in prior segments of the proceeding), (2) that the Philippines is a significant producer of the comparable merchandise, and (3) that there was no other information of record indicating that other countries on the OP List are significant producers of comparable merchandise. In so finding, Commerce also noted that Jiheng had placed export data for Thailand with respect to Harmonized Tariff Schedule ("HTS") subheadings 2828.90 and 2828.10, the subheadings for comparable merchandise calcium hypochlorite and sodium hypochlorite, respectively, and, as such, had argued that Thailand should therefore be considered a significant producer of comparable merchandise, but Commerce did not comment further in the context of its significant producer finding. Commerce observed in its "Data Availability" analysis, however, that none of the Thai financial statements Jiheng submitted were sufficient for calculating financial ratios due to countervailable subsidies indicated therein.

421 (1991). Pointing out that its rate leapt upwards based largely on the same Philippine surrogate

sources used by Commerce in the *Sixth Review* and due to the fact that Commerce denied it a major

by-product cost offset that it had been previously granted, Kangtai states that it relied upon

Commerce's reasonable previous surrogate value practice and methodology "to its detriment",

particularly with regard to country selection and the surrogate values for chlorine, sodium hydroxide

and for by-product offsets.

Similar arguments were found unpersuasive in *Foshan Shunde Yongjian Housewares

& Hardwares Co., Ltd. v. United States*, 37 CIT ___,  896 F. Supp. 2d 1313 (2013) ("*Foshan

Shunde*"). In that case, the plaintiff also complained of unfair notice and detrimental reliance. The

court was persuaded by the defendant's argument that a certain memorandum, from C. Showers to

R. Weible dated February 24, 2011, *re* "List of Surrogate Countries for new shipper review of

Certain Steel Nails from [the PRC]" (as quoted at page 3 and note 2 of the petitioner's rebuttal brief

in that investigation[8]), where Commerce noted "the disparity in per capita GNI between India and

[the PRC] has consistently grown in recent years, and should this trend continue, the Department

may determine in the future that the two countries are no longer 'at a comparable level of economic

development' . . .", which memorandum preceded the surrogate country memorandum for that

review released on June 8, 2011, undercut the plaintiff's claim of a lack of notice. The court further

noted that the plaintiff " 'oddly suggest[s]' that it would have reported FOPs differently had it

---

[8]  *See* Court No. 12-00069, ECF No. 42 (Feb 15, 2013) at Appx. 23 (petitioner's rebuttal brief); *see also Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the PRC*, 77 Fed. Reg. 14499 (Mar. 12, 2012) (final results admin. review) and accompanying "I&D Memo" at 8; *Certain Steel Nails from the PRC*, 76 Fed. Reg. 56147 (Sep. 12, 2011) (preliminary rescission and partial revocation of new shipper review) (*NB*: Issues and decision memoranda pertaining to administrative proceedings other than the one at bar are hereinafter abbreviated "I&D Memo.").

known which surrogate country would be selected[,] because it was required to report accurate FOPs

-- irrespective of the surrogate country". 37 CIT at ___, 896 F. Supp. 2d at 1319-20. The court did

not accept that argument. *See id.* The review at bar, initiated in July 2012, has similar "advance

warning" about the growing GNI disparity between India and PRC.[9] Although there may be a

certain reliance interest in the gathering and preparation of surrogate country data for an

administrative review, to which *Foshan Sunde* does not appear to speak, Kangtai has not

persuasively elaborated on its detrimental reliance argument. This court therefore finds Kangtai's

arguments in this regard likewise unpersuasive.[10]

    Kangtai's substantive complaint is that Commerce only summarized its arguments

in the *Final Results* and failed to actually address the vast majority of Kangtai's arguments in the

*IDM* analysis. Kangtai contends the review at bar relies on unexplained conclusions and/or weak

precedent from the *Sixth Review*. Emphasizing that Commerce did not find India *not* economically

comparable to the PRC, only less so, Kangtai argues that Commerce has not, contrary to its stated

position, complied with its policy of "considering" other potential surrogates advocated by the

parties. *See*, *e.g.*, Kangtai's Br. at 9-13.

    Again here relying on *Ad Hoc Shrimp Trade Action Comm. v. United States*, 36 CIT

___, ___, 882 F. Supp. 2d 1366, 1374 (2012) ("*Ad Hoc Shrimp*") and *Amanda Foods (Vietnam) Ltd.*

---

 [9] *See Clearon Redetermination*, Court No. 13-00073, at 15 & n.32, referencing Remand Data Memorandum, specifically the attachment, "Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the PRC* (Oct. 28, 2010).

 [10] That said, and notwithstanding that Kangtai did not otherwise press the point, the court questions whether providing the OP list six months after initiation of the review can be accurately characterized as an attempt to "resolve" the composition of the OP List "early on the proceeding". *See IDM* cmt. 1 at 10; Def's Resp. at 11-12.

*v. United States*, 33 CIT 1407 (2009) ("*Amanda Foods*"), which both held that all surrogate value

criteria must be considered individually as well as weighed together in the evaluation of competing

surrogate countries, Kangtai criticizes the prior judicial decision on the *Sixth Review* and maintains

that the statute does not support interpreting economic comparability as a "rigid concept and also

a threshold determination paramount to all other considerations in selecting a surrogate country."

Kangtai's Reply at 2.  Commerce's own Policy Bulletin 04.1, according to Kangtai, does not "abide

by the interpretation that economic comparability is a threshold" because that bulletin requires a

complete weighing of the significance of production and data quality in addition to economic

comparability, regardless of the "sequence" in which Commerce considers those criteria.  By way

of example, it points to *1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the PRC*, 79 Fed. Reg.

16280 (Mar. 25, 2014) (prelim. rev. results) and *Certain Frozen Fish Fillets From the Socialist*

*Republic of Vietnam*, 79 Fed. Reg, 19053 (Apr. 7, 2014) (final rev. and new ship. results) ("*Frozen*

*Fish Fillets 2011-2012*") as instances where Commerce went outside the OP List in its choice of

surrogate country, either because none of the OP-listed countries were significant producers of

comparable merchandise or because the non-listed country sourced the "best" information for the

primary input. Thus does Kangtai fault Commerce (and this court) for impermissibly failing to

engage in the "precise analysis directed by the Court" in *Amanda Foods* and *Ad Hoc Shrimp*.

Kangtai Br. at 8.

        Arguing here again the choice of India as the primary surrogate, Kangtai repeatedly

faults Commerce for relying solely on GNI, for finding countries on the surrogate country list

"equally comparable" despite varying GNIs, for failing to engage in any basic comparison of the

relative economic comparability to the PRC, for taking a "narrow view" on economic comparability,

and for "declin[ing] to consider any countries outside of this very narrow group" while at the same time taking an "expansive" view that the countries were all "equally significant producers" based, presumably, only on the export data provided by the petitioners. Kantai's Br. at 8, referencing *PDM* at 7, *IDM* cmt. 1 at 6-7, and Clearon's Surrogate Country Cmts., PDoc 86 (Mar. 1, 2013), at 5-6. Such an interpretation, Kangtai maintains, is contrary to *Shandong Rongxin Imp. & Exp. Co. v. United States*, 35 CIT ___, ___, 774 F. Supp. 2d 1307, 1314 (2011) (Commerce "does not explain how treating a country with *any* quantity of exports actually accounts" for significant production) (italics in original).

Kangtai's arguments are wide of the mark and misrepresent what it argued before Commerce. Although Kangtai argued in favor of "other economic factors, such as the size of the economy, purchasing power, and workforce population" in making the economic comparability determination, Commerce found the "record . . . devoid of any material describing the relationships between these factors and the level of economic development". Commerce also determined that the "size" of the economy, GDP, and workforce population do not reflect "economic development" in any event. *IDM* cmt. 1 at 8-9. The court in this matter adheres to precedent holding that "primary" reliance on *per capita* GNI in compiling the surrogate country list is reasonable and in accordance with law in determining the statutory requirement of "one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country". As previously discussed, *Ad Hoc Shrimp* and *Amanda Foods*, unlike the *Sixth Review* as well as the matter at bar, concerned the selection of the primary surrogate country from among countries that had made the list of potential surrogates. The distinguishing fact here, as in the prior review of chlor-isos, is that India has not been included in the list of countries at comparable economic

development, and the court rejects the notion that Commerce's policy of narrowing the list of countries to a band, around a "level", of economic comparability is in violation of the statute.

Specifically, regarding the *Frozen Fish Fillets 2011-2012* proceeding to which Kangtai refers,[11] in the decision memorandum accompanying the preliminary results therefor,[12] Commerce explains, not unreasonably, that the number of countries that are at a "comparable" economic level depends on how broadly "level" is defined, and that it is simply not administratively feasible to manage long lists of potential surrogate countries based on an "expansive" interpretation of "level". For the review at bar, Commerce determined "there is either no data on the record for any FOP or usable surrogate financial statements for Colombia, Costa Rica, Indonesia, South Africa, and Thailand" and therefore "these countries will not be considered for primary surrogate country selection purposes at this time." *PDM* at 9-10.

Assuming the correctness of those findings, *arguendo*, it was not inappropriate, contrary to Kangtai's contentions, for Commerce to (1) "narrow" a list of countries within a band for purposes of administrative feasibility, (2) take an "expansive" view of which of those countries should be considered "significant producers" for purposes of further comparison, and then (3) not engage in further analysis when no countries but one were left to compare, due to a lack of quality data among those countries on the OP List. Thus, on Kangtai's broad contention, the court perceives

---

[11] Kangtai's Br. at 11, referencing *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 79 Fed. Reg, 19053 (Apr. 7, 2014) (final rev. and new shipper results for 2011-2012).

[12] *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 78 Fed. Reg, 55676 (Sep. 11, 2013) (prelim. results) and accompanying decision memorandum at "Surrogate Country".

little to distinguish the facts at bar from those analyzed in *Clearon I*, *supra*, and here generally adheres to that analysis.

It is also critical to note at this point that for this *Seventh Review*, as in the *Sixth Review*, Commerce did not find India to be economically *in*comparable to the PRC; Kangtai simply "tee-ed up" to Commerce for the *Seventh Review* the issue of India's consideration in its administrative case brief by, apparently, conditioning that consideration on finding neither the Philippines nor Thailand suitable as a surrogate country.  *Cf.* Kangtai's Case Br at 17 ("If the Department Finds the Record Surrogate Data for Thailand and the Philippines is Unsuitable, Kangtai has Placed India on the Record for the Final Results") (bolding omitted) *with IDM* cmt. 1 at 5 ("If the Department Finds the Record Surrogate Data for Thailand and the Philippines is Unsuitable, India is the Best Overall Choice as the Primary Surrogate Country") (italics omitted). Thus, Kangtai argued foremost in its case brief for the use of countries that were on the OP List (*i.e.*, Thailand over the Philippines).  On the other hand, the argument's construction was in accordance with how Commerce had been conveying its "consideration" of the problem, *i.e.*, that it would not consider any data of countries that were not on the list unless *no* country on the list had sufficient data. However, Kangtai here does not intimate that its arguments were the consequence of trying to navigate between Scylla and Charybdis before Commerce during the review.  That is, if Kangtai had desired to avoid ceding to Commerce that the quality of the data of every country on the OP List had to be disproved before Commerce would consider the data quality of a country not on the OP List, then it seems to the court that it should have been incumbent upon Kangtai to press for consideration of Indian data foremost.

For the *Final Results*, Commerce concluded that "Kangtai has not demonstrated that the selection of the Philippines is inappropriate, or that Thailand represents a more suitable alternative primary surrogate". *IDM* cmt. 1 at 6.  Assuming, again *arguendo*, support on the record for that statement, Commerce's conclusion is not otherwise unreasonable.  Kangtai here complains of Commerce's statement that it "would only resort to using Indian data sources when no other data from these economically comparable countries are available", *IDM* cmt. 1 at 9, as running counter to departmental practice and the agency's mandate to use the "best available information" whatever its provenance, Kangtai's Br. at 10, and, indeed, Commerce's position here would appear at odds with its articulation of its policy that its surrogate country lists are non-exhaustive and only a "*starting point*" (Commerce's emphasis) for the surrogate country selection process, pursuant to which all listed countries are initially regarded as equivalent and unranked.  *See, e.g.*, *Clearon Redetermination*, Court No. 13-00073, at 6.  In that redetermination on the prior administrative review, Commerce stated that it

> considers other . . . countries that are not at the same level of economic development as the NME country, but nevertheless still at a level comparable to that of the NME country.  As a general rule, the Department selects a surrogate country that is at the same level of economic development as the NME unless it is determined that none of the countries are viable options because (a) they either are not significant producers of comparable merchandise, (b) do not provide sufficient reliable sources of publicly available surrogate value (SV) data, or (c) are not suitable for use based on other reasons.[ ]  Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.[ ]

*Id*. (footnotes omitted).  *Cf. id*. at 14 (selection of a country not on the list as the primary surrogate country "requires that data *or* significant producer considerations outweigh *per capita* GNI proximity concerns") (italics added), *with id*. at 15 ("as the *per capita* GNI disparity increases, [it

reaches a point where] the Department can no longer discount this fact when selecting among competing surrogate countries"), *and id*. at 38 ("[W]hile India may have a significant chemical industry comparable to the PRC, as claimed by Kangtai, the significance of the chemical industry is irrelevant to the Department's analysis of the level of economic development. This argument goes to another factor entirely, that is of significant producer.").

        In the final analysis of the matter at bar, at any rate, Commerce's position is that it had reliable information from the Philippines.  Whether that is indeed the case, *see infra*, it is also arguable whether Commerce did, in fact, "consider" the information on India, albeit in the manner argued by Kangtai.  *See supra*.  The fact that Commerce claims to have had reliable information from the Philippines does not appear to have been what obviated any further or deeper consideration of the Indian data in this instance; rather, it appears to have been due to Kangtai's waiting until the post-preliminary stage to submit Indian FOP data.  Commerce found that

> the submission of Indian FOP data itself was not untimely or inappropriate. However, the consideration of India as a potential surrogate country for the first time at the briefing stage of the instant review is exactly the type of scenario that the Department has previously found to "create undue administrative difficulties" and be "potentially unfair to the parties."  Therefore, we are not in a position to address the merits of Kangtai's argument that India represents the best overall choice as a primary surrogate country.

*IDM* cmt. 1 at 10 (footnotes omitted).

        The issue appears to have been one of persuasion, not of law or of application of policy, and Kangtai's arguments do not render Commerce's selection -- of a country that was on the OP List, found to be a significant producer of comparable merchandise, and found to have (*arguendo*) "reliable" data -- in this instance unreasonable.  Commerce was simply not persuaded

that India was an appropriate selection over the Philippines, based on the arguments for India, and, importantly, on the timing of Kangtai's presentment of the supporting data.

Nonetheless, the facts before the court are more akin to *Jiaxing Brother Fastener Co. v. United States*, 38 CIT ___, 961 F. Supp. 2d 1323 (2014) ("*Jiaxing Brother I*") than to *Amanda Foods* or *Ad Hoc Shrimp*. Because of defects in the analysis of certain surrogate values that led to the selection of the Philippines as the chosen primary surrogate country,[13] judicial *imprimatur* of the selection thereof at this point would obviously be inappropriate, as Commerce must maintain discretion with respect thereto on remand, in particular with respect to further consideration of the data for India (concerning which the timing of the data's presentment is therefore no longer an issue) in accordance with the following.[14]  *See*, *e.g.*, *Clearon II*.

### B.  Selection of the Philippines over Thailand as the Primary Surrogate Country

Apart from India, Kangtai also argues that Commerce's selection of the Philippines rather than Thailand as the primary surrogate country was unsupported by substantial evidence, because Thailand was the most economically similar to the PRC based upon per capita GNI, was

---

[13]  The *IDM* states that for the *Preliminary Results* Commerce found that the Philippines is the appropriate surrogate country based on the fact that: (1) the Philippines is at a level of economic development comparable to that of the PRC; (2) the Philippines is a significant producer of comparable merchandise; (3) the Philippines has publicly available and reliable data, especially for "important" inputs; and (4) the Philippines is the sole country with contemporaneous SV data for all inputs and surrogate financial statements for producers of comparable merchandise.  *IDM* cmt. 1 at 6, referencing Prelim. Results SV Memo, PDoc 141 (July 2, 2013), at 2.  That surrogate value memorandum does not elaborate, however, on what the important inputs are; therefore, consistent with the *Sixth Review*, the court will here presume chlorine to be foremost among them.

[14]  *Intrinsecus*, the court has considered Kangtai's other arguments on the issue and finds them either unavailing or not meriting greater discussion here.

a more significant producer of comparable merchandise than the Philippines, and possessed superior quality of data over the Philippines based upon the quantity of suitable financial statements. Kangtai's Br. at 17-20.

Citing *Qingdao Sea-line Trading Co., Ltd. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014), Commerce responds that Kangtai did not raise the argument that Thailand was more economically similar to the PRC than the Philippines during the administrative proceeding and is therefore barred from raising the issue here. Def's Resp. at 26-27. However, the court rejects the notion that Commerce's duty to determine the "best" information of record is constrained by the parties' arguments with respect thereto. *See, e.g.*, Policy Bulletin 04.1 (if more than one country satisfies the criteria of being economically comparable and a significant-producer of merchandise for surrogate country selection purposes, "the country with the best factors data *is selected*" as the primary source of surrogate information) (italics added).

Basing its surrogate country decision upon the "best factors" data, Commerce determined that the Philippine financial statement of MVC constituted the best available information to calculate financial ratios, because it was the only financial statement on the record that included specific line items for SG&A expenses, thereby allowing direct calculation of the surrogate financial ratios. *IDM* cmt. 1 at 8. Specifically, Commerce stated:

> With respect to the issue of subsidies, the Department's practice is not to rely on financial statements where there is evidence that the company received countervailable subsidies and there is other, more reliable and representative data on the record for purposes of calculating the surrogate financial ratios.[ ] Kangtai argues that MVC benefitted from countervailable subsidies, with the result that its financial statements are unsuitable to use. Our review of MVC's financial statements leads us to conclude that the alleged subsidies do not contain any reference to any of the specific programs that the Department has previously found to be countervailable.[ ]

> In sum, the Department finds that we have single financial statements from both the Philippines and Thailand that reflect no evidence of receipt of countervailable subsidies, are both publicly available, contemporaneous with the POR, and reliable.[ ] However, we note that only Philippine producer MVC's financial statements include specific line items for SG&A expenses that allow the Department to directly calculate the surrogate financial ratios. Therefore, the Department finds that the MVC's financial statements are the best available information for calculating the surrogate financial ratios for these final results.

*IDM* cmt. 1 at 8.  By contrast, Commerce found that not all FOPs could be valued using Thai values,

and that "[t]wo key inputs, in particular require the use of less contemporaneous data (labor), or rely

on data from a country outside the Department's surrogate country list (chlorine from India)." *IDM*

cmt. 1 at 7.

With respect thereto, Kantai raises three points.  First, Kangtai notes that the *IDM*

states that using Thailand would require valuing chlorine using data for the non-listed country India,

and Kangtai continues to argue that Commerce cannot reasonably rely on *any* import value for

chlorine because chlorine is not frequently traded internationally in commercial quantities, and

therefore reliance on a chlorine import figure can never be "best" over a domestic source such as

India's.  To the extent Kangtai is here arguing for the use of Indian domestic chlorine data, the point

is addressed *infra*; if Commerce ultimately rejects the Philippines as its primary surrogate country

on the basis of overall data concerns, then obviously Commerce will need to revisit the pros and

cons of Thailand in the parties' battle over primacy of surrogacy.

Second, Kangtai contends that if Commerce found the Philippine import statistic

reliable, then "it stands to reason" that Commerce could have selected Thailand as the primary

surrogate country and used the Philippine domestic chlorine values to supplement suitable Thai data.

Kangtai's Br. at 19.  Commerce, however, contends Kangtai failed to raise the argument during the

administrative proceedings and therefore waived the ability to raise it here.  Commerce further

contends the administrative determination is in accordance with its preference of valuing all factors

in a single country where possible.  19 C.F.R. §351.408(c)(2).  The court finds that Kangtai has

failed to exhaust this point, and therefore its argument does not provide independent ground for

remand of this issue.  *See*, *e.g.*, *Shandong Huarong Machinery Co., Ltd. v. United States*, 30 CIT

1269, 1305, 435 F. Supp. 2d 1261, 1292 (2006).

 Third, Kangtai contends Commerce prefers multiple financial statements and that

selecting the Philippines largely based on the only financial statement for that country was

unreasonable because the financial statement shows evidence of countervailable subsidies.  This

point is addressed in the following section.

 Kangtai's arguments to this point do not persuade that Commerce's selection of the

Philippines over Thailand was erroneous; thus, whether Commerce's selection can be concluded as

supported by substantial evidence and in accordance with law depends upon the following.

C.  Selection of Surrogate Financial Information

 As mentioned, an NME respondent's NV is calculated based on the FOPs for labor,

materials, and energy, as well as manufacturing overhead and general expenses (SG&A), plus profit.

*See* 19 U.S.C. §1677b(c)(1).  SG&A expenses and profit are constructed via surrogate financial

ratios calculated, to the extent possible, from publicly available financial statements of producers

of identical or comparable merchandise.  *See* 19 C.F.R. §351.408(c)(4).  Commerce has maintained

a consistent preference for surrogate values that are contemporaneous with the period of review,

publicly available, product-specific, representative of broad market average prices, and free of taxes

and import duties, *see*, *e.g.*, *Xiamen Intern. Trade and Indus. Co. v. United States,* 37 CIT ___, ___,

953 F. Supp. 2d 1307, 1312-13 (2013), as well as for valuing all FOPs from a single country, the

primary surrogate, *see, e.g., Jiaxing Brother Fastener Co. v. United States*, 38 CIT ___, 11 F. Supp.

3d 1326 (2014) ("*Jiaxing Brother II*").   Commerce explained that mixing and matching SG&A and

profit data from different countries was particularly inappropriate for SG&A expenses and profit,

and sourcing FOPs from a primary surrogate country would curtail "margin shopping" of FOPs from

different countries. *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7345 (Feb. 27,

1996).   "Commerce has [also] a stated preference for the use of the domestic price over the import

price, all else being equal."   *See Rhodia, Inc. v. United States*, 25 CIT 1278, 1287, 185 F. Supp. 2d

1343, 1352 (2001) ("*Rhodia*"); *see also, e.g., Hebei Metals & Minerals Imp. & Exp. Corp. v. United

States*, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1274 (2005) ("*Hebei Metals*").

> For the *Final Results*, Commerce relied upon financial statements for Mabuhay Vinyl

Corporation ("MVC"), a chemicals producer of the Philippines, for SG&A expenses and profit.

Kangtai contends this is the sole financial statement for the Philippines of record and that MVC

"likely benefitted from countervailable subsidies," thereby rendering the Thai data superior.   By

contrast, Kangtai continues, Commerce completely ignored the fact that one of the Thai financial

statements, for Siam PVS Chemicals Co., Ltd. ("Siam PVS"), had no evidence of countervailable

subsidies, and no party suggested that it did.   As such, Kangtai argues, the data for Thailand were

"better" from the standpoint that there was an "untainted" financial statement on the record to

represent industry surrogate financial costs.   Kangtai Reply at 9.

> Commerce, however, did not completely ignore Siam PVS.   The petitioners had

argued to Commerce that Siam PVS's financial statement does not identify production or sales of

sodium hypochlorite and contains no breakdown of the costs of goods sold, *see IDM* cmt. 1 at 5, and

Commerce apparently agreed.  The court is not free to disagree, as substantial evidence supports Commerce's conclusion.  *See Universal Camera*, *supra*, 340 U.S. at 488 (a court may not "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*").

Nonetheless, Kangtai disagrees that the MVC financial statement "reflect[s] no evidence of receipt of countervailable subsidies", arguing that the determination is not supported by substantial evidence.  *Cf. IDM* cmt. 1 at 8 *with* Kangtai's Case Br. at 14-15 (arguing that Commerce had found several programs by the Philippines Board of Investment to be countervailable including "Tax Deduction of Direct Labor and Local Raw Materials," "Tax Credit on New Local Content," "Tax Exemption on Imported Capital Equipment," and "Tax Deduction to Export Trading Companies"), referencing Jiheng Final SV Submission at Ex. 17.  Even if Kangtai is correct, the point does not completely render Commerce's finding on the usefulness of SG&A in the MVC statement unsupported by substantial record evidence or unreasonable, because Commerce stated in the *IDM* that its "practice is not to rely on financial statements where there is evidence that the company received countervailable subsidies *and* there is other, more reliable and representative data on the record for purposes of calculating the surrogate financial ratios."  *IDM* cmt. 1 at 8 (italics added).  The decision on whether to rely on a particular financial statement (even one tainted, *arguendo*, by subsidies) is record-dependent, *see, e.g.*, *DuPont Teijin Films v. United States*, 37 CIT ___, ___, 896 F. Supp. 2d 1302, 1310-11 (2013) ("Commerce could have reasonably concluded that it would be the best available information if the other financial statements on the record were even more distorted"), referencing, *inter alia*, 19 U.S.C. §1677b(c), and it is not for the court to choose between arguably untainted but incomplete data and arguably complete but tainted data, as that is

Commerce's province.  Kangtai's arguments do not persuade  that the substantial evidence of record

could only lead to the conclusion that the Thai data unequivocally "bested" the Philippine data of

record.  *See Universal Camera*, *supra*, 340 U.S. at 488.[15]

### D.  Possible Double-Counting of Labor in Surrogate SG&A

#### 1.  Further Background

Regarding the labor FOP, Commerce now employs a rebuttable presumption that the

industry-specific labor cost data, if available, prevailing in the primary surrogate country as reported

in Chapter 6A the International Labour Organization's Yearbook of Labor Statistics ("Yearbook")

"better accounts for *all* direct and indirect labor costs."[16]  *Labor Methodology*, 76 Fed. Reg. at 36093

(italics added).  Because ILO Chapter 6A data are intended to be all-inclusive of labor costs,

Commerce further explained in *Labor Methodology*, that

> If there is evidence submitted on the record by interested parties demonstrating that
> the NME respondent's cost of labor is overstated, the Department will make the

---

[15]  *See also Consolo*, *supra*, 383 U.S. at 620 ("[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence").

[16]  *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36092 n.3 (June 21, 2011) ("*Labor Methodology*"). *Labor Methodology* was the consequence of the Federal Circuit's invalidation of Commerce's prior regression-based analysis provided in 19 C.F.R. §351.408(c)(3).  *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372 (Fed. Cir. 2010).  As explained in *Labor Methodology*, Commerce first resorted to reliance upon ILO Chapter 5B labor cost data, but because those data only cover direct labor compensation and bonuses, Commerce became concerned that such data were underinclusive.  Thus, going forward, Commerce announced in *Labor Methodology* that it would rely on ILO Chapter 6A instead.  And whereas in the past Commerce distinguished between direct labor cost and indirect labor cost that was accounted either as a part of the surrogate value for factory overhead or as part of labor, in accordance with *Labor Methodology* it now appears the cost of "labor" as a whole is to be calculated simply by multiplying the labor hour input by the relevant ILO-based unit labor cost figure.

> appropriate adjustments to the surrogate financial statements subject to the available information on the record.  Specifically, when the surrogate financial statements include disaggregated overhead and selling, general and administrative expense items that are already included in the ILO's definition of Chapter 6A data, the Department will remove these identifiable costs items.

*Id.*

In the *Preliminary Results*, Commerce  relied on data reported by the Philippines to the ILO in Chapter 6A of the Yearbook.  *PDM* at 17.  Commerce used as its basis for its labor calculation the hourly rate of US\$ 3.63 (*i.e.*, the Php[17] equivalent) for the "compensation of employees" working in the manufacture of chemicals and chemical products, sub-classification 24 of ISIC-Revision 3.  *See* Prelim. Results SV Memo at 7 and Appx. III.48.

Kangtai argued in its case brief that the Philippines ILO data do not provide the labor costs or employee compensation that Commerce seeks to calculate for Kangtai, and that Commerce should instead use data from the Philippines Bureau of Labor and Employment Statistics (BEAMS) from the 2012 Philippine Industry Yearbook of Labor Statistics for 2007, the most recent year in which appropriate labor statistics are available, because the BEAMS data for "Employment, Hours and Earnings Survey" are the sole source used to compile the Philippines ILO Chapter 6A labor data.  *See* Kangtai's Br. at 27-28; Kangtai's Reply at 10-12.

For the *Final Results*, Commerce found inconclusive support for that claim, and that in any event "it appears that ILO Chapter 6A labor data and the BEAMS labor cost data are capturing the same labor costs."  *IDM* at 16.  Due to doubt on the BEAMS' data's contemporaneity

---

[17] Drawing from *Clearon II*, Philippine pesos will herein be abbreviated either "Php" or "P".

and current useage, Commerce essentially found that Kangtai had failed to rebut the presumptive

usefulness of the ILO Chapter 6A data.  *Id*

Kangtai here argues Commerce misunderstood the entirety of its claim, to wit, that

the BEAMS data, in addition to being source data, demonstrate that certain labor items are being

double counted from the MVC financial statement upon which Commerce chose to rely upon for

SG&A expenses.  To bolster its argument before Commerce, Kangtai provided revised financial

statement calculations that took into account, using BEAMS data, the costs for salaried directors,

managers, executives, administrative personnel, and sales personnel.  *See* Kangtai's Br. at 46-47,

referencing, *inter alia*, Kangtai's Final SV Submission (Sep. 12, 2013) at SV-14, p. 1.  Kangtai

argues *Drawn Stainless Steel Sinks From the PRC*, 78 Fed. Reg. 13019 (Feb. 26, 2013) (final LTFV

determ.) and accompanying I&D Memo at cmt. 4, pp. 14-15, for example, is comparable to this

segment because the record reflects that domestic labor statistics are more detailed and more

appropriate than these countries' ILO-reported labor data.  Kangtai   *See*, *e.g.*, Kangtai's Br. at 24;

*see also* Kangtai's Case Br. at 47.

Arch echos the double-counting claim, albeit via a different analysis.  Arch argued

before Commerce for adjustments to Commerce's labor figures to account for "employee benefits"

and "retirement benefits" included in the SG&A of the financial statement for MVC ("Financial

Statement"), the company on which financial ratios were based, because those amounts are already

included in Commerce's presumptive ILO Chapter 6A data.  Arch's Br. at 17-20.

Commerce dismissed these claims in the *Final Results*.  *IDM* cmt. 6.D. at 36-37.

Commerce distinguished between "manufacturing costs" (costs initially allocated and capitalized

as inventory and subsequently expensed as cost of goods sold) and "period costs" (expensed in full

in the period when incurred) and took the position that when financial statements identify and classify labor costs as either manufacturing related labor costs or SG&A-related labor costs, it would rely on those classifications in the financial statements unless there is a good reason to believe the classifications are inaccurate.  Agreeing that retirement benefits were provided to all of MVC's "regular employees," Commerce nonetheless concluded that this meant that because MVC's Financial Statement included separate classification of manufacturing costs and operating expenses, it would presume that the reported costs of the retirement benefits in the "operating expenses" section (*i.e.*, period costs) reflected only those costs relating to administrative staff, and that the manufacturing cost section properly included all manufacturing-labor related items, including any employee and retirement benefits for direct and indirect labor.  *See id.*

## 2.  Analysis

Kangtai and Arch here contend that by failing to make adjustments to account for the labor figures in MVC's SG&A, Commerce has overstated the financial ratios' labor component. Kangtai's Br. at 23-24; Arch's Br. at 17-20.  Commerce responds that the arguments do not identify specific line items in the ILO Chapter 6 data and MVC's financial statements that indicate that employee benefits were overstated or improperly allocated between the "cost of sales" and "operating expenses" sections.  Def's Resp. at 33.  However, to the extent Arch drew attention to those items in the Financial Statement that Arch (and Kangtai) contends are being double-counted, Commerce's statement is incorrect, and the remainder of Commerce's argument establishes a burden that is not present in Commerce's announced practice: there is no support for the proposition that a respondent must go "behind" the ILO data that Commerce has already determined is the best labor rate in order to identify the line item within the reported earnings that shows that MVC's retirement

benefits are included in the ILO data, as those data are presumptively all-inclusive, and such a requirement would be impossible to prove in any event, given that the ILO data are not company-specific.

Commerce also argues that it had substantial reason to believe that the retirement benefits related to the administrative personnel only, because although Note 21 of the Financial Statement states that retirement benefits "are provided to all its regular employees", there is no definition provided for "regular employees."[18] Clearon adds that Jiheng and Kangtai do not provide any "direct evidence" to contradict Commerce's interpretation of the Financial Statement, that the reference in Note 21 of the Financial Statement to MVC's "defined benefit retirement plans" is ambiguous, and that Commerce could reasonably "disagree that this statement means that retirement benefits for the entire company, including the factory workers whose salaries are included in the costs of goods sold section of the income statement, are included in the operating expenses section of the income statement and are being double counted." *IDM* cmt. 6.D. at 37.[19] Clearon argues that

---

[18] The defendant further argues that because Commerce was unable to conclude whether "regular employees" included any direct laborers or factory workers and might only encompass administrative personnel, and because it is not unusual for administrative personnel to have retirement benefits and for production workers not to have such benefits, Commerce reasonably concluded that the retirement benefits were properly included in the operating expenses section of the income statement and that it did not include benefits, if any, for the factory workers whose salaries fell under the cost of sales section of the income statement. Arch argues this is indefensible *post hoc* rationalization. *See, e.g., SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). The court agrees. Nowhere in the *Final Results* or the *IDM* did Commerce mention this interpretation of "regular employees" as only referring to administrative personnel; rather it seemed to acknowledge that factory workers received retirement benefits but disagreed where those expenses were classified. In any event, the defendant's argument is not supported by substantial evidence. *See infra.*

[19] Clearon also notes that retirement and employee benefits to "key management personnel" alone account for one-half of the total retirement and employee benefits identified under operating expenses. *See* Clearon's Final SV Submission, PDoc 153 (Sep. 12, 2013), Ex. 1, at 35.

the Financial Statement itself supports Commerce's construction to a substantial degree and that the construction is consistent with "accounting practice."  Clearon Resp. at 28-29.

In short, Commerce's position rests upon cost accounting practice in interpreting the employee and retirement benefits among MVC's SG&A as pertaining solely to administrative staff, while Arch's position is that Commerce has not indicated any evidence to support the assumption that all retirement benefit expenses incurred for its "regular employees" are only for the administrative staff.  Commerce did not, for example, find from the record that the inclusion within SG&A of employee and retirement benefits for all of the company's employees, including those involved in manufacturing, would have been *inconsistent* with Philippine accounting standards -- nor could it, since the record does not include relevant statements of Philippine accounting standards.

The court concludes that Arch, supported by Kangtai, has provided a cogent and persuasive analysis of the Financial Statement indicating that Commerce's conclusion lacks substantial evidence on the record.  The MVC 2011 Financial Statement relied upon by Commerce states that "The Company has a registered, non-contributory retirement plan" and that "*All regular employees are covered from the President down to the rank and file*"[20] and MVC's 2012 Annual Report states that "The Company has a funded, noncontributory defined benefit retirement plan, administered by a trustee, covering its permanent employees";[21] Arch argues that by using such statements, MVC thereby "confirmed" that the references to "regular employees" are consistent with

---

[20]   *See* Clearon's Prelim. SV Submission, PDocs 92, 93 (Mar. 15, 2013) parts 2 and 3, Ex. 8, p. 18 (italics added).

[21]   *See* Clearon's Final SV Submission, Ex. 1, p. 18.

the normal meaning of the business term,[22] and thus the term "regular employees" means retirement benefits apply to all of MVC's permanent employees -- "from the President down to the rank and file."  Arch thus argues that the Financial Statement itself explains that all retirement benefit expenses incurred for its regular employees "are reported as operating expenses."

Continuing, Arch also points to Note 18 to the Financial Statement as identifying the details of "Cost of Sales"[23] and breaking out direct labor as one of the items included therein (albeit without further detail of what, precisely, is included in the labor costs) and also providing "extensive" information on the retirement benefits at pages 13-14.  Arch notes that the Financial Statement's brief description of the plan, including how the benefits liability is determined, again provides no distinction between direct labor and administrative staff, and that the Financial Statement at page 19 discusses how retirement benefit costs are estimated, again without distinguishing between the costs for direct labor and other labor.  Most importantly, Arch notes that this portion of the Financial Statement concludes: "The retirement benefits payable amounted to P 18.42 million and P 18.12 million as of December 31, 2011 and 2010, respectively.  *The retirement benefits costs recognized amounted to P 7.30 million in 2011*, P 7.91 million in 2010 and

---

[22]   Arch argues that the term "regular employee" is a common business term used extensively, as found, for example, in the U.S. Department of Labor regulations at 29 C.F.R. §§ 553.30, 779.234, and 1910.120(F)(4), and that U.S. Department of State regulations even provide a definition:

> A regular employee means for purposes of this subchapter:
> (1) An individual permanently and directly employed by the company, or
> (2) An individual in a long-term contractual relationship with the company
> where the individual works at the company's facilities . . .

22 C.F.R. § 120.39(a).

[23]   *See* Clearon's Prelim. SV Submission, PDocs 93 & 94 (Mar. 15, 2013), at Ex. 8, p. 26.

P 9.40 million in 2009 (See Note 21)." *Id*. at 19 (italics added).   Arch summarizes that this

discussion describes generically how the costs are determined.  Critically, it does not itemize P 7.30

million (the amount reported under operating expenses) for administrative staff *and some other*

*amount for direct/indirect labor* but rather the context demonstrates that the P 7.30 million reflects

the total cost of the retirement benefits for 2011 for "*all* regular employees."

       That is not all.  Arch also directs attention to Note 21 to the Financial Statement, in

which MVC reiterates, to wit, that the "funded, noncontributory defined benefit retirement plan" is

for all regular employees and that "The following tables summarize the components of net

retirement expense recognized in the consolidated statements of income and the funding status and

amounts recognized in the consolidated balance sheets." *Id*. at 28.  Note 21 then provides several

tables, one identifying the components of the retirement expenses charged to operations (the P 7.30

million); the second providing the details of the retirement benefits payable; the third the changes

in present value of the retirement benefit obligations; the fourth the fair value of plan assets; the fifth

the actual returns on plan assets; the sixth the major categories of the net plan assets; the seventh the

assumptions used to determine retirement benefit obligations; and the eighth the information

regarding yield rates. *Id*. at 28-30.  "At no time does the Financial Statement distinguish the costs

between direct labor and other labor or between factory workers and administrative staff."  Arch's

Br. at 19.

       Arch argues that for Commerce's assumption to make sense, at some point in the

Financial Statement's extensive discussions of the retirement plan costs it would have indicated that

it was only discussing the portion of the plan relating to administrative staff, whereas Note 21 states

that it is discussing the "net retirement expense recognized in the consolidated statements of

income." If the Financial Statement were recognizing that expense in two different fields -- one in direct labor and the remainder in operating expense -- it would seem incumbent to provide *some* information on the retirement benefit expenses included in the direct labor; otherwise, Note 21 would not reflect the "net retirement expense recognized in the consolidated statements of income." The context, Arch contends, demonstrates that P 7.30 million is the benefit cost of the entire retirement benefit plan, not just the portion for administrative staff, and "[w]hen the annual report, itself, states that the retirement benefit expense reported in the SG&A line item expense covers all retirement benefit expenses incurred by the company and that all regular employees receive retirement benefits, there is simply no basis for Commerce's assumption" regardless of whether it may be said that such assumption is "consistent" with Philippine accounting standards.

Commerce's reasoning, by contrast, does not appear to be a cogent rebuttal of the foregoing. In view thereof, Arch and Kangtai thus persuade that remand is necessary in order to ensure that indirect labor costs are not being double counted. This is not an instance of "displac[ing] the [agency's] choice between two fairly conflicting views", *Universal Camera*, *supra*, 340 U.S. at 488;[24] the administrative interpretation, that the retirement and employment benefits itemized as SG&A expenses in MVC's financial statement pertain *only* to administrative staff, simply lacks substantial evidence of record -- in particular those accounting standards that would demonstrate Commerce's interpretation to be a reasonable assumption. The court has been referred to no evidence on the record as to what the "consistent" accounting treatment of these types of employee

---

[24]   *See also Consolo*, 383 U.S. at 620 ("[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence").

and retirement benefits should be, and thus no evidence as to the "required" accounting treatment, and there is no finding on the record that Arch's and Kangtai's argued interpretation is inconsistent with accounting practice or standards. *Cf. Thor Power Tool Co. v. CIR*, 439 U.S. 522, 544 (1979) ("Accountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions[, and they] tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."). In sum, Commerce's assumption is insufficient to address the salient points Arch makes by its more thorough and detailed analysis of the MVC's financial statement. Whether Arch's interpretation, as supported by Kangtai's arguments, presents the more accurate and reasonable interpretation of the MVC's financial statement, which finding the court is not at liberty to make, the assumption of the type upon which the *IDM* analysis rests is not based on substantial evidence but on an incomplete analysis, and the issue must therefore be remanded for further explanation or reconsideration anew, resulting in adjustment of impacted financial ratios, if that is the consequence thereof.

### E.  Surrogate Valuation of Chlorine

#### 1.  Further Background

As in the prior review, for the *Final Results* Commerce had to select a surrogate value for Kangtai's chlorine input.

Kangtai's chlorine requirements were in excess of 15,000 metric tons during the POR.[25]  The six surrogate countries on the OP List combined together only imported about 5,900

---

[25] *See IDM* cmt. 2.G. at 20 (stating that "Kangtai alone purchased over 15 million kilograms
(continued...)

metric tons of chlorine.  Kangtai therefore argued, *inter alia*, that the nature of chlorine has not

suddenly changed, that Commerce should continue to find, for that reason and others, that chlorine

is not "frequently traded in commercial quantities," and that for the purposes of surrogate valuation

of the chlorine input Commerce should use domestic prices from India, for which it pointed to the

annual production from one particular company of 29,539 metric tons of chlorine, valued at about

5,581 rupees per metric ton (approximately US$ 112 during the POR), on display at page 60 of the

2010-2011 Annual Report for Kanoria Chemicals & Industries Ltd. ("Kanoria"), an Indian producer

of chemical intermediaries.  *See* PDoc 109 at Ex. SV-7.

          The petitioners argued for the use of Global Trade Atlas ("GTA") import price

statistics, which revealed a total of 1,611 metric tons of chlorine imported into the Philippines, with

an average unit value ("AUV") of US$ 0.21 per kilogram ("kg"), or US$ 210 per metric ton.

          Kangtai argued against this GTA data for several reasons.  Commerce, however, took

the position that it had previously addressed most of these arguments in the prior *Sixth Review*.  In

that review, it found that Philippines GTA import data were the only data available to value chlorine

from the Philippines and were not aberrational.  For the review at bar, Commerce again selected the

Philippines GTA data as a surrogate value for chlorine because it did not find the AUV for

Philippine chlorine import data aberrant, with the Philippine import volume being the third highest

among the other equally economically comparable countries' imports, and because 1,611 metric tons

represents "commercial quantities".  *IDM* cmt. 2.G. at 21, referencing, *inter alia*, *Glycine from the*

*PRC*, 77 Fed. Reg. 64100 (Oct. 18, 2012) (final rev. results) ("*Glycine from the PRC*"), and

----

[25] (...continued)
of chlorine during the POR").

accompanying I&D Memo cmt. 1 at 6 (finding total volume of 2,000 metric tons of imported

chlorine to represent imports of "commercial quantities").[26]

## 2.  Analysis

While Commerce has discretion in choosing among surrogate values for FOPs, *see*,

*e.g.*, *Nation Ford Chemical Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("*Nation*

*Ford*"), the statute requires that valuation of FOPs "be based on the best available information

regarding the values of such factors in a market economy country or countries" that Commerce

considers "appropriate." 19 U.S.C. §1677b(c).  In that consideration, it is Commerce's duty to

ensure that the antidumping rates are as accurate as possible.  *See Rhone Poulenc, Inc. v. United*

*States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

To value material inputs, Commerce has expressed a general preference for using

import statistics, because they are "publicly available published information" and do not include

domestic taxes or subsidies.  *See Hand Tools Final Results, Heavy Forged Hand Tools, Finished*

*or Unfinished, With or Without Handles, from the PRC*, 60 Fed. Reg. 49251, 49252 (Sept. 22, 1995)

(final rev. results) ("*Hand Tools*").  This appears consistent its with administrative practice of

selecting the "best available information" for valuing FOPs that are product-specific, representative

of a broad-market average, publicly available, contemporaneous with the period of review, and free

---

[26]  More specifically, in *Glycine from the PRC*, Commerce selected Indonesian GTA import
data to value chorine upon finding that they represented commercially significant quantities, and that
the Indonesian GTA import prices for chlorine were not aberrational because Indonesia's average
unit value was within the range of values from countries included on the surrogate country list and
because Indonesia imported the highest volume of chlorine among the countries on the list. *See
Glycine*, I&D Memo at cmt. 1.  Commerce stated that the *Glycine from the PRC* review was unlike
prior reviews, in which it had rejected import prices to value chlorine on the basis of import volume
of one metric ton, because the import volume for Indonesia exceeded 2,000 metric tons. *See id.*
Commerce thus determined that Indonesian import data were commercially representative. *See id.*

of taxes and duties.  *See Certain Polyester Staple Fiber From the PRC*, 75 Fed. Reg. 1336 ( Jan. 11.

2010), and accompanying I&D Memo at cmt. 1.

       If the import data reveal a "small" total quantity over the period under consideration,

Commerce's practice is to determine if the price for the imports is aberrational.  *See Shakeproof*

*Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp.

2d 1354, 1360 (1999).  Commerce has determined aberration by comparing the average import price

against other sources of market value.  *See, e.g., Certain Cut-to-Length Carbon Steel Plate From*

*the PRC*, 62 Fed. Reg. 61964, 61981 (Nov. 20, 1997) (final LTFV determ.) ("[f]or pig iron, we were

unable to use the Indian Monthly Statistics as we determined that the import price was aberrational

because the Indian data was based on a very small quantity and was almost two times the price of

the Indonesian pig iron."); *see also Hand Tools*, *supra*, 60 Fed. Reg. at 49253 (Commerce's practice

is to check import statistics against "sources of market value if the total quantity imported under a

specific category was small"; if the value was found to be aberrational, *i.e.*, "too" high or "too" low,

Commerce chooses another surrogate value).

       Similar to its arguments in the *Sixth Review*, Kangtai makes several broad points: (1)

Commerce does not reasonably explain its departure from prior determinations finding that the high

costs associated with transport of hazardous chemicals like chlorine makes import statistics therefor

suspect; (2) "useable" chlorine data is not the standard, "best available" data[27]; (3) it is misleading

to aggregate an unspecified number of smaller import transactions into the Philippines into a total

commercial "quantity" (or quantities) of 1,611 metric tons from all import transactions collectively

---

[27] Kangtai's Br. at 26-27, referencing *Jiaxing Brother I*, *supra*, 38 CIT at ___, 961 F. Supp.
2d at 1333.

over the POR, which amount is not commercially significant especially when compared with the fact

that Kangtai purchased over 15,000 metric tons during the POR; (4) the total imported volume of

chlorine into the Philippines cannot validly be compared to its own chlorine requirements; (5) the

GTA data for the Philippines are "wide-ranging" and aberrant; and (6) Commerce does not

adequately explain why the Philippine GTA data are the "best" available information above the

Indian data proffered for the record in light of the administrative preference for domestic data over

import data for the type of chemicals at bar (*see* first point).

      Several of these points are interrelated, but Kangtai's last point overreaches,

somewhat.  Kangtai argues that Commerce has stated that it prefers domestic over import prices

"especially when, like in the present case, the import value is significantly higher than the domestic

price,"[28] but there is no indication on the record as to what the Philippines domestic price was during

the POR.  Kangtai's argument, rather, is for comparing, at a minimum, the Philippines import price

with the Indian domestic price *à la Jiaxing Brother I*, *supra*, 38 CIT at ___, 961 F. Supp. 2d at 1332-

35, which observed that the significantly lower domestic Indian price, as compared to the Indian

import price and the fluctuation in the Indian import volumes and prices, revealed comparable

disparities and fluctuation in the Thai import volumes and prices, implying that the "only reasonable

inference one could draw from the administrative record is that the Thai import values are similarly

---

[28] Kangtai's Br. at 29-30, referencing *Hebei Metals*, *supra*, 29 CIT at 300, 366 F. Supp. 2d at 1274 ("[T]he preference for domestic data is most appropriate where the circumstances indicate that a producer in the hypothetical market would be unlikely to use an imported factor in its production process. The most obvious circumstances occurs where the import price is significantly greater than the domestic price.") and *Yantai Oriental Juice Co. v United States*, 26 CIT 605, 617 (2002) (rejecting more contemporaneous import data because the agency failed to explain why the industry would purchase more expensive imported coal over domestic source).  *See also*, *e.g.*, *Zhengzhou Harmoni Spice Co., Ltd. v. United States*, 33 CIT 453, 492, 617 F. Supp. 2d 1281, 1316 (2009) and cases cited.

affected and thus do not reflect domestic Thai HCL prices." Kangtai argues the Indian data for

chlorine in the record at bar are at least relevant for that purpose, *i.e.*, analysis of the Philippine data.

Remand for that purpose is at least appropriate in accordance with *Clearon II*.

Adhering to the course of *Clearon II* here, the court finds that validity of Kangtai's

first point, *supra*, ultimately depends upon the validity of Commerce's ultimate conclusion.[29] Doubt

arises on that conclusion.

With regard to Kangtai's argument that it is misleading to aggregate an unspecified

number of smaller import transactions into the Philippines into a "commercial quantity" total of

1,611 metric tons, Commerce contends that, similar to *Glycine from the PRC*, for this *Seventh*

*Review* it determined that the Philippines imported the third highest volume of chlorine determined

from among the countries included on the surrogate country list, *IDM* cmt. 2.G. at 21-22, and that

given the *Glycine from the PRC* determination of 2,000 metric tons of chlorine imports as

commercially significant, 1,611 metric tons of chlorine imports into the Philippines cannot be

dismissed as commercially insignificant.[30]  The court previously noted that *Glycine from the PRC*

---

[29]  Final findings in prior reviews become the law of the case and "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently".  *See Dongbu Steel Co., Ltd. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011).

[30]  Clearon also responds that the reliability of the Philippine data were proven because they were "within the range" of data for countries on the OP List and that Kangtai provides no evidence that those transactions were commercially insignificant.  Clearon's point suffers from the same shortfalls, however, in that obviously the Philippine import data would be "within the range" (*i.e.*, circular reasoning is not proof), and Commerce's conclusory statement that the aggregate of the import transactions forms a "commercial quantity" does not mean that the underlying transactions were (*i.e.*, absence of evidence is not evidence of absence).

is under appeal,[31] and as explained below, other evidence of record detracts from this commercial

significance finding.

      With regard to Kangtai's argument that the total imported volume of chlorine into

the Philippines cannot validly be compared to its own chlorine requirements, Kangtai's Br. at 30-31,

Commerce and Clearon both contend that in the determination of whether import volume data

represent commercially significant commercial quantities, the administrative policy is to make cross-

country comparisons of import volumes of potential surrogate countries to one another, rather than

comparing import volume to the purchases of respondent companies, and that the policy is due

deference so long as it is reasonable.  The court has previously agreed with Commerce that "the

question is whether the *relative* quantity of imports is distortive."  *Trust Chem Co. Ltd. v. United

States*, 35 CIT ___, ___, 791 F. Supp. 2d 1257, 1265 (2011) ("*Trust Chem*").  Providing an example

thereof, *Trust Chem* noted that a country's import data representing "only a small fraction" of a

country's "domestic consumption" of the imported good would result in a distorted comparison. *See

id*.  Here, there is some indicia on this record of what the Philippines' domestic consumption of

chlorine was during the POR, but that is not the only "relative" comparison that would shed light

on the Philippines' chlorine import data (and the reasonableness of Commerce's position) in

accordance with *Trust Chem* and other decisions.

      As indicated, Commerce states that its policy is "not to compare import volume to

the purchases of respondent companies", *e.g.*, *IDM* cmt. 2.G. at 21, and it claims that the reason

behind the policy is that in the calculation of NV, the price the producer in the surrogate country

---

[31]  *See generally Baoding Mantong Fine Chemistry Co., Ltd. v. United States*, Court No. 12-00362; *see also id*., ECF No. 30, Motion for Judgment (July 22, 2013) at 20-23.

pays for the input in the production of subject merchandise is determinative, *i.e.*, that it does not

need to "duplicate" the exact production experience of the respondents.  *E.g.*, Def's Resp. at 44,

referencing *Longkou Haimeng Mach. Co., Ltd. v. United States,* 33 CIT 603, 612-13, 617 F. Supp.

2d 1363, 1372-73 (2009) ("*Longkou Haimeng*").  But, regardless of whether Commerce need not

duplicate the exact production experience of the respondents, the respondents' actual production

experiences may not be ignored in that consideration.  *See, e.g.*, *Taian Ziyang Food Co., Ltd. v.*

*United States*, 33 CIT 828, 862-64, 637 F. Supp. 2d 1093, 1126-27 (2009) ("*Taian Ziyang Food*").

As previously noted in *Clearon II*, Commerce's statement and position is at odds with

the fact that it focused on respondent production experience as part of its consideration in

*Polyethylene Terephthalate Film, Sheet, and Strip from the PRC*, 73 Fed. Reg. 55039 (Sep. 24,

2008) (final LTFVdeterm.)[32] and accompanying I&D Memo at 2, and again in *Polyethylene*

*Terephthalate Film, Sheet, and Strip from the PRC*, 77 Fed. Reg. 14493 (Mar. 12, 2012) (final rev.

results) and accompanying I&D Memo at issue 4, and Commerce has done likewise in numerous

other contexts.[33]  It is true, as Commerce highlights, that *Nation Ford*, *supra*, stated that "[t]he 'best

---

[32]  *See also Fuwei Films (Shandong) Co., Ltd. v. United States*, 36 CIT ___, ___, 837 F. Supp. 2d 1347, 1355 (2012) (noting Commerce's reason for rejecting import statistics in that case, to wit, that they "contained an insignificant quantity of imports not representative of the DuPont Group's PET chip purchase volume or consumption experience").

[33]  Commerce has repeatedly considered the importance of a respondent's production experience in such cases as, *e.g.*, *Certain Steel Wheels From the PRC*, 77 Fed. Reg. 17021 (Mar. 23, 2012) (final LTFV determ.) and accompanying I&D Memo at cmt. 8 ("these data allow for separate valuation of rim and disk HRS inputs based on width and thickness of the input (consistent with respondents' production experience)"), *Drill Pipe From the PRC*, 76 Fed. Reg. 1966 (Jan. 11, 2011) (final LTFV determ.) and accompanying I&D memo at cmt. 6 ("the Department has determined that HTS 8431.43.90 is not representative of the input consumed by the DP-Master Group"), *Freshwater Crawfish Tail Meat From the PRC*, 75 Fed. Reg. 79337 (Dec. 20, 2010) (final rev. and new shipper results) and accompanying I&D Memo at cmt. 3 ("the Spanish import prices may or may not, arguably, constitute information that is directly representative of the production experience of the

available information' concerning the valuation of a particular factor of production may constitute

information from the surrogate country that is directly analogous to the production experience of the

NME producer . . . *or it may not*" (italics added), 166 F.3d at 1377, but that does not give Commerce

license to overlook a respondent's actual production experience when choosing an appropriate

surrogate value.   Essentially, the only reason Commerce offers here for doing so seems to be

"because we say so." The court continues to hold that a chosen import dataset must "adequately

approximate[ ] the respondents' production experience". *Taian Ziyang Food*, *supra*, 33 CIT at 862,

637 F. Supp. 2d at 1126.

        In *Glycine from the PRC*, Commerce acknowledged, but was not persuaded by, the

respondent's arguments therein that its own purchases during the period reviewed amounted to 62%

of all of the primary surrogate country's imports of chlorine during that period.   Kangtai's

production experience here, by contrast, is far in excess of that comparison, comprising requirements

of chlorine that were over *nine times* the total imports into the Philippines during the POR.   The *IDM*

also provides the conclusory statement that "[t]he Philippine import data are not aberrational based

on the quantity and the per-unit value when compared to the other countries found by the

Department to be equally economically comparable to the PRC."   *IDM* cmt. 2.G. at 21, referencing

Kangtai's Case Brief, PDoc 181 (Nov. 29, 2013), at 37.   On page 37 of that referenced brief, Kangtai

lists the import data for each country on the OP list (Indonesia, Costa Rica, the Philippines,

Colombia, South Africa, and Thailand), the total US$ value and total quantities in kilograms, the

---

respondents in these reviews"), *Circular Welded Austenitic Stainless Pressure Pipe from the PRC*,
75 Fed. Reg. 51788 (Sep. 5, 2008) (prelim. LTFV determ.) and accompanying I&D Memo at
"Selection of Surrogate Country" ("because India better represents the experience of producers of
subject merchandise and provides better financial data[,] we have selected India as the surrogate
country").

AUV, and the percentage out of total kilograms for all listed country's import data.  Of those, the

Philippines' AUV is the lowest at US$ 0.21/kg (or US$ 210 per metric ton), while Indonesia and

Costa Rica, with total imports in metric tons of 2,305.6 and 1,887.2, respectively, both show AUVs

of US$ 0.54/kg (US$ 540 per metric ton).  Colombia, South Africa, and Thailand, with total imports

in metric tons of 84.0 9.7 and 3.0, respectively, display AUVs of US$ 0.50, US$ 3.54, and US$ 3.40,

respectively.

   The court here is not engaged in re-weighing the evidence, merely observing.

Notwithstanding that the Philippines is the lowest AUV of record (and more proximate to the India

value for which Kangtai argues), the average AUV of the listed countries is over twice that of the

Philippines chlorine import data and the Thai data is over seven times that average.  However, the

*IDM's* dismissal of the variability of these AUVs was only conclusory, and therefore unreasonable,

particularly in light of the fact that the import prices of chlorine in this review are evidently far more

wide-ranging than the chlorine import prices rejected by Commerce in the 2009-2010 review.[34]

*See* Kangtai's Br. at 29.  The *IDM* addressed the argument that the Philippine import data were

wide-ranging only to the extent of quoted acknowledgment in the *Sixth Review* I&D Memo that the

rejected Indian import data considered in the 2009-2010 administrative review ("*Fifth Review*") had

been found wide-ranging as compared to other potential surrogate countries, thereby justifying in

part their disregard and resort to other data (to wit, "because other viable source information from

the primary surrogate country was on the record, the Department opted to disregard the Indian GTA

---

[34] *See, e.g.*, *AR09-10 Chlor-Isos* Prelim. Results SV Memo at 12 and Att. XXXII(a) (India
AUV US$ 0.31/kg; Philippines AUV US$ 0.18/kg; Indonesia AUV US$ 0.70/kg; Peru AUV US$
0.48/kg; Thailand AUV US$ 7.83/kg).

data"). *IDM* cmt. 2.G. at 21, quoting *Sixth Review* I&D Memo at cmt.7.  The *IDM* then states that in the *Fifth Review*, Commerce had been able to conclude from a comparison of import prices and domestic prices in the primary surrogate country "that, due to a discrepancy in the pricing between domestic prices and import prices, as well as the average unit price ranges of the potential surrogate countries, chlorine was not frequently traded", whereas in the present review it had no domestic prices for chlorine from the primary surrogate country (the Philippines) to make such a comparison. *Id*. at 22.[35]

But, the fact that there were no domestic Philippine price data of record against which to compare the Philippine import data does not resolve the question of aberrancy or end the analysis. Commerce was not restricted to relying only upon Philippine domestic price data in that analysis, as it had at least one other source of domestic market information of record with which to compare the import data -- India.  In that regard, the situation here bears similarity to *Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 28 CIT 480, 494-96, 318 F. Supp. 2d 1339, 1352-54 (2004) ("*Shanghai Foreign Trade*"), in which the record thereof "reveals indications that the 1,132 metric tons of pig iron imported into India during the period of investigation are not commercially significant."  28 CIT at 495, 318 F. Supp. 2d at 1352.

There, as here, Commerce's decision was essentially *ipse dixit* and failed to establish that the amount imported into India "was statistically or commercially significant and demonstrates no apparent consideration of that issue."  *Id.*  There, as here, Commerce "did not explain its decision to deviate from its past practice, under which it normally would ensure that a small quantity of

---

[35]  Commerce also reiterated that in *Glycine from the PRC* it "recently found that chlorine is being traded internationally."  *IDM* cmt. 2.G. at 22 (citation omitted).

imports did not produce a price that is aberrational relative to other sources of market value." *Id*. The Indian data of record here are "sources of market value" that Commerce could have, but did not, consider. *Cf. id*. Commerce states that it refused to consider the Indian chlorine data simply because India is not on its "economically comparable" list. But that is not a sufficient reason for disregarding that data altogether, or simply for the purpose of testing the normality or aberrancy of the import data.

Commerce's preference for valuing all FOPs from a single surrogate country "to the extent possible" has not been held unreasonable, but "to the extent possible" must still yield to reason and the sourcing of particular surrogate values from outside the primary surrogate country if the record so compels. Commerce's policy statement on why it prefers to value all FOPs from a single surrogate country is in order to prevent "margin shopping", 61 Fed. Reg. at 7345, which assumes a certain equivalence in and between the qualities of the competing data sources to act as an accurate surrogate representation of the FOP or FOPs under consideration. That is not the case here, nor was it in the *Sixth Review*, when Commerce chose India as its "secondary" surrogate country in the preliminary determination thereof, even though India, then as now, was not on Commerce's list of "primary" economically comparable countries. Further, Commerce's reasoning with respect to the *Fifth Review*, above, only addressed Kangtai's argument in part but did not address its point regarding the agency's stated preference for domestic over import prices where these types of chemical products are concerned, which in prior reviews was particularly emphasized in Commerce's taking official notice of the factual issue of chlorine's "special concerns" in packaging and transport as a hazardous material. As such, with respect to Kangtai's remaining arguments on the point, Commerce's response is a *non-sequitur*.

Aside from Kangtai's interest in valuing chlorine on the basis of Indian data, as between Indian domestic prices and import statistics for the Philippines, Commerce's fundamental explanation in the *IDM* rests on the finding that the Philippines had useable (*i.e.*, "reliable") data. That does not explain why all of the Philippines data points relied upon are the "best" data in comparison with each of their respective other data points of record, in particular those argued for by Kangtai, *cf. Jiaxing Brother I, supra*, whereas Kangtai's point is that while Commerce prefers to value all inputs from the primary surrogate country, it has appropriately looked to data sourced from other countries, even outside of the surrogate country list (and GNI band), and that the record evidence of data for Kanoria, a domestic Indian source, is "far superior", Kangtai alleges, to the Philippine import statistics for chlorine. Kangtai's Br. at 25-27. Kangtai additionally pointed out that Kanoria's production capacity dwarfs that of the entire Philippines' annual imports, easily encompassing all of Kangtai's annual chlorine requirements as well, and Kangtai summarizes that it was not asking Commerce to "duplicate" its exact production experience,[36] it was offering its own experience and that of Kanoria, a chlorine producer of record, as evidence of what is a reasonable commercial quantity for purposes of this proceeding, because Commerce had not offered any reason or basis, beyond its reference to *Glycine from the PRC*, for finding, now and in the prior review, that suddenly chlorine is shipped in commercial quantities, and that its previously expressed concerns regarding import statistics for these chemicals were suddenly no longer of concern. *See, e.g.,* Kangtai's Reply at 15. Kangtai also pleads that the fact that the only commercial entities on the record consume and produce significantly more than an entire country's imports during an entire

---

[36] Kangtai's Reply at 15. *See Longkou Haimeng, supra*, 33 CIT at 612-13, 617 F. Supp. 2d at 1372-73, citing *Nation Ford, supra*, 166 F.3d at 1377.

year "must" bear additional weight on Commerce's "unsupported understanding of what a commercial quantity is." *Id*. Kangtai, thus, frames the issue, as it perceives it, as follows:

> The fundamental question that looms over the AR6 and AR7 appeals is why a rational producer dependant on chlorine inputs would abandon India, with its vast chemical production, for the Philippines with almost no domestic chlorine production or imports.

Kangtai's Br. at 13.

Of interest here is Clearon's response.  In arguing that the comparison offered by Kangtai is "misleading," Clearon argues that MVC, the Philippine producer upon whose financial statements Commerce determined to rely for SG&A, is itself a "major" domestic producer of chlorine, and therefore it is untrue that the Philippines had "almost no" domestic chlorine production:

> It is not surprising therefore that the volume of chlorine imports might be small relative to Kangtai's usage rate. *Large-volume customers would logically source from a domestic producer.*  At the same time, there is no evidence to suggest that the import prices are different from domestic Philippine prices or that import prices are affected by the market price in the Philippines.  Therefore, as it did in the *Sixth Review*, Commerce was correct to rely upon the GTA import data to value chlorine and its determination in this regard is supported by substantial evidence on the record.

Clearon's Resp. at 38.

The point calls attention, again, to Commerce's apparent preference for domestic prices over import data.  As to a lack of evidence of import-domestic price difference, it is Clearon and Commerce, rather, who bear that burden, which amounts to a presumption as to the impact of prior pronouncements on the nature of these chemicals, and which Commerce has not adequately addressed for purposes of this review.  Commerce only addressed that "preference" to the extent of implying that it had no Philippine domestic prices for analysis, and that the Philippine import data

were therefore, *ipse dixit*, "reliable" (in the sense of being "best").  If the quality of the Indian domestic data with respect to chlorine are in fact the most representative of Kangtai's actual experience than the data of record for chlorine from all the other countries on the surrogate country list (*e.g.*, minute import transactions over the entire course of the POR that had to be aggregated to make one "commercial quantity"), as argued by Kangtai, Commerce needs to explain how it can be the case that those Indian data for chlorine must yield, nevertheless, to an administrative preference for valuing all FOPs from a single primary surrogate country without  relegating the statutory term one "*or more* market economy countries" (italics added) to "second-class" status, as above indicated. *See*, *e.g.*, *Camau Frozen Seafood Processing Import Export Corp. v. United States*, 37 CIT ___, ___, 929 F. Supp. 2d 1352, 1355-56 (2013) ("*Camau Frozen Seafood*") ("it is not sufficient for Commerce to cite the policy of using a single surrogate country where, as here, there is reason to believe that the primary surrogate country may not provide the best available information for a particular FOP").

Clearon argues (1) that India is not a "comparable" economy that made the GNI band, (2) that so long as the Philippine GTA chlorine statistics were product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review and free of taxes and duties, the regulation "called for" the use of these data, (3) that the fact that an Indian company, Kanoria, reported chlorine prices below the level of imports into the Philippines does not undermine the Philippine data because India is not economically comparable, and (4) that even if the Philippine chlorine values had not been available on the record it would "not be appropriate" to use Indian domestic prices so long as values from one of the other surrogate countries were

available. These points do not logically follow from 19 C.F.R. §351.408(c)(2), however.  At best,

Clearon describes the "normal" situation, not the exception.

Clearon also stresses, again, that "it is well-settled that Commerce need not duplicate

the respondent's exact behavior",[37] but, again, that only highlights the exception, not the "norm" or

larger point: "a surrogate value must be as representative of the production process in the NME

country as is practicable, if it is to achieve the statutory objective of assigning dumping margins as

accurately as possible." *Longkou Haimeng*, *supra*, 33 CIT at 613, 617 F. Supp. 2d at 1372.  The

commercial significance of import statistics is not something in the abstract, they must be reflective

of, if not "exactly" reflecting, such significance in comparison with actual experience, of the

producers or exporters of the input under consideration, to the extent possible.  *Cf. Fuwei Films*,

*supra*, 36 CIT at __, 837 F. Supp. 2d at 1355; *Taian Ziyang Food*, *supra*, 33 CIT at 862, 637 F.

Supp. 2d at 1126 ("Commerce has failed to establish that its chosen dataset . . . adequately

approximates the respondents' production experience"); *Shanghai Foreign Trade*, *supra*,  28 CIT

at 495, 318 F. Supp. 2d at 1352 (indications on record that amount of input imported into India was

not commercially significant included fact that it was one-half of one percent of half the annual

amount produced by just one Indian domestic company); *cf. also Shakeproof Assembly Components

Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (1999)

("*Shakeproof*") (if import statistics are based on a small quantity of imports for the period under

consideration, administrative practice is to determine if the price for those imports is aberrational).

---

[37]  Clearon's Resp. at 37-38 (citation omitted).

Because Commerce's explanation on the issue as a whole does not appear to encompass full consideration of Kangtai's arguments,[38] it is appropriate that the issue of surrogate valuation of chlorine be remanded for additional consideration or reconsideration as a whole, for the above reasons and for consistency with *Clearon II*.

## F.  Surrogate Valuation of Ammonium Chloride

In the *Final Results*, Commerce used GTA import data from the Philippines to value ammonium chloride.   Commerce found that 5,464 kilograms of ammonium chloride imported into the Philippines is within the range of import quantities from other countries, *i.e.*, from 380 kilograms to 1,168,873 kilograms, albeit at the low end.   *See IDM*, cmt. 2.H. at 23; PDoc 155 at Ex. SV-4. Again, of course, they are "within range" -- by definition -- and the average unit values ranged from US$0.54 to US$ 26.72 per kilogram. The Philippines' average unit value was US$ 4.70, which was at the low end of the range.   Commerce concluded therefrom that these data were not aberrational or otherwise unreliable; in particular, the *IDM* states that the fact that "import quantities and an input may be smaller than a company's annual consumption does not mean that the import quantities are non-commercial or aberrational."   *IDM*, cmt. 2.H. at 23.

Similar to the issue of valuing chlorine in this matter, Kangtai argues that the Philippine import data are aberrant and unrepresentative, comprising a small quantity of ammonium chloride imported at a substantially higher per-unit value than larger quantity imports of ammonium

---

[38]   However, regarding Kangtai's contention that the BIS data indicated that Philippine imports from Hong Kong were not liquid chlorine, Commerce also found that "Kangtai did not demonstrate how the BIS data tie to the total import data reported in the GTA."   *Id*. at 22.   On this point, the court agrees with Commerce that Kangtai failed to definitely establish that non-liquid forms of chlorine were included in the Philippine GTA data.

chloride imported into the other listed surrogate countries.   Kangtai's Br. at 31-34, citing *Shakeproof*, 23 CIT at 485, 59 F. Supp. 2d at 1360 ("administrative practice with respect to aberrational data is to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries") (internal quotes and citation omitted).   Kangtai argues Commerce should have used the Indian domestic source or the South African import source.

Commerce again responds that the quantity and average unit values were "within the range" of imports of ammonium chloride into the other countries on the surrogate country list, and that therefore the data were not aberrational.  *Shakeproof*, Commerce argues, did not order exclusion of Indian import prices simply because they were high but rather because they had the highest value after an Indonesian rate that was "clearly aberrational", and it further argues the court has elsewhere recognized that numerical differences alone do not necessarily indicate that the price data are distorted or misrepresentative.  *See Trust Chem*, *supra*, 35 CIT at ___, 791 F. Supp. 2d at 1263-64.  Commerce again notes that its policy is to compare total import volumes across potential surrogate countries, not to compare import volumes to the purchases of respondent companies or other companies which it determines to be less economically comparable, and that simply because import quantities may be smaller than a company's annual consumption does not mean that import quantities (or prices) are non-commercial or aberrational.  Clearon adds that *Shanghai Foreign Trade* requires that the quantity be a "commercial" quantity, not a "respondent's" quantity, and that when there are domestic sources for a particular input as here (MVC is a major domestic producer of chlorine in the Philippines), it is not reasonable to require that imports alone be sufficient in volume to supply an NME factory.

The latter part of the argument may have a certain appeal, but it falls short here, because the Philippine domestic data for MVC are not being used to evaluate the reasonableness of the import value of either chlorine or ammonium chloride.  Commerce does not mention it.  As for what constitutes a "commercial" quantity, the relevant context would include the fact that the Philippine import quantity of ammonium chloride is 128 times smaller than Kangtai's purchases, and Commerce has not offered a reason why a respondent's individual requirements are not relevant to its analysis of record information.  Comparing cross-country quantities and average unit values may impart some significance, but simply informing that it is Commerce's policy to ignore, in effect, the commercial realities of the producers or exporters being considered does not explain that policy or make the policy reasonable.  Moreover, as discussed regarding the valuation of chlorine, doubt arises as to whether this is even consistent policy as applied.

A determination that does not consider all record information is contrary to law, based on long-established court decisions, and the statutory requirement to base factor values is on the "best available information."  19 U.S.C. § 1677b(c)(1)(B).  *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence").  There may be instances when only a cross-country comparison of import quantities and average unit values will suffice, but Kangtai pointed out that an international shipping container used to transport a raw material typically will contain 20,000 kilograms, and that Kangtai alone consumed many times more ammonium chloride than was theoretically available in the surrogate country (700,000 kgs compared to an available 5,464 kg).  As with chlorine, Commerce had to aggregate the entire amount of ammonium chloride imported into the Philippines during the POR

in order to find a "commercial quantity" of approximately 5,000 kilograms, or one quarter of one commercial container.  Apart from the rest of the Philippine chemicals industry, Kangtai alone would not have been able to even come close to maintaining its operations in the Philippines or producing the subject merchandise, due to a shortage of this commodity (and also that of chlorine).  To assume that the Philippine import data could possibly reflect the commercial reality of Kangtai is not a reasonable assumption, and therefore substantial evidence of record does not support that the Philippine import data reflect the commercial reality of this FOP in this case.

G.  Surrogate Valuation of Sodium Hydroxide

As in the prior review, for the *Final Results*, Commerce selected Philippine GTA import data collected by GTA for the HTS number for sodium hydroxide to value "sodium hydroxide".[39]  *See IDM* cmt. 5.D. at 33.  Kangtai argues that the record reflects that it consumed sodium hydroxide at a concentration of 32%, which is lower than the 50% concentration that it claims is reflected in the GTA HTS data, and that Commerce should have made a downward adjustment to the surrogate value for sodium hydroxide in accordance with *Synthetic Indigo*,[40] Commerce, it claims, should make a downward adjustment.  Kangtai's Br. at 35.

Commerce declined, explaining that the record contains information that sodium hydroxide is commercially traded at different levels of concentration, not just 50% as asserted by

---

[39]  The parties sometimes refer to sodium hydroxide (NaOH) as lye or caustic soda.  The court notes that the common names would also cover potassium hydroxide (KOH).

[40]  *See Synthetic Indigo from the PRC*, 68 Fed. Reg. 53711 (Sep. 12, 2003) (final admin. review) ("*Synthetic Indigo*") and accompanying I&D Memo at cmt. 5, referencing *Saccharin from the PRC*, 68 Fed. Reg. 27530 (May 20, 2003) (final LTFV determ.) and accompanying I&D Memo at 2.

Kangtai, and that there is no information on the record regarding the concentration level reflected in the Philippine GTA import data for sodium hydroxide.  Clearon adds that the Explanatory Notes to the HTS provision under which sodium hydroxide is imported, heading 2815, do not put any limitation or range on the concentration classified in that heading.   Clearon's Resp. at 41, referencing PR 169 at Ex. 8.   Commerce contends Kangtai's argument ignores the fact that in *Synthetic Indigo* it had been able to determine that the surrogate value data source in question (the "Monthly Statistics of the Foreign Trade of India") represented prices for chemicals at commercially traded concentration levels, whereas there is no such information regarding the Philippine GTA import data on this record.

Kangtai argues that it presented in full that as a general matter of international commerce sodium hydroxide is traded at a 50% concentration, and that it is specifically imported at a 50% concentration by at least one major chemicals company in the Philippines, MVC, the only company identified as a producer of comparable merchandise in that country.  Kangtai complains that Commerce's response is "to point to out a small piece of record evidence for the possibility of a different conclusion", and that Commerce "would have the [c]ourt accept its conclusion that the Philippines trades in atypical concentrations that are not normally traded."  Kangtai's Reply at 18. Kangtai insists that it is uncontradicted on the record that sodium hydroxide is typically and normally sold commercially at 50% concentrations (and notwithstanding that HTS heading 2815 or the Explanatory Notes do not distinguish between concentrations), and therefore a downward adjustment to the Philippine GTA import data for sodium hydroxide was and is appropriate.

The court is not persuaded that Kangtai offered sufficient proof of what a downward adjustment would entail.  Certainly it offered proof that its production relies on a 32% concentration

and that MVC imports at a 50% concentration, but that does not overcome what Commerce considered would be an "arbitrary" adjustment, given the uncertainty of what concentrations the GTA data actually encompass via Philippine HTS 2815 .  The court cannot substitute its judgment for that of Commerce on this issue.  *See*, *e.g.*, *Bristol Metals L.P. v. United States*, 34 CIT 478, 484, 703 F. Supp. 2d 1370, 1376 (2010) (refusing to "substitute its own evidentiary evaluation for Commerce's" and "its own judgment for the agency's in considering and weighing the relative importance of various criteria applied") (quoted source omitted).

### H.  Surrogate Valuation of Electricity

For the *Final Results*'s surrogate valuation of electricity in the Philippines, Commerce analyzed *Camarines Sur* rate data, National Power Corporation ("NPC") rate data, and Manila Electric Company ("Meralco") rate data pursuant to the usual factors of public availability, broad market average,  product specificity, contemporaneity, and freedom from taxes and duties.[41] As in the prior review, Commerce selected the *Camarines Sur* data on the ground that they are "publicly available from the primary surrogate country, represent electricity rates for industrial users in two cities in the Philippines, and do not appear to include taxes or duties."  *See IDM* cmt. 2.E. at 18-19.

Kangtai argues that Commerce should have used either the NPC data or, here joined by Arch, the Meralco data.  Kangtai's Br. at 35-39; Arch's Br. at 16-17. Commerce responds that Arch and Kangtai are merely asking this court to reweigh the evidence, while referring to administrative determinations that do not support their arguments.

---

[41] *See*, *e.g.*, *Certain Polyester Staple Fiber From the PRC*, 75 Fed. Reg. 1336 ( Jan. 11. 2010), and accompanying I&D Memo at cmt. 1.

1.  Publicly Availability

Relying on *Certain Steel Threaded Rod From the PRC*, 78 Fed. Reg. 21101 (Apr. 9, 2013) (prelim. rev. results) and accompanying prelim. SV memo at 4 ("*Threaded Rod*"), which in turn relies upon or references *Certain Steel Nails from the PRC*, 78 Fed. Reg. 16651 (Mar. 18, 2013) (final admin. review 2010-2011) and accompanying I&D Memo at cm. 1 ("*Steel Nails 2010-2011*"), Kangtai argues the *Camarines Sur* data are no longer publicly available because the source link to those data "is no longer working and this information is now absent from the webpage[,] signifying the electricity rates are no longer publicly available."  Kangtai's Br. at 36.  *Steel Nails 2010-2011* stands for the proposition that when the web link that was placed on the record to corroborate the public availability of a certain statement became non-functional, Commerce was unable to duplicate the search; therefore it deemed the web link unusable and the statement non-public.

Commerce argues *Threaded Rod* (and *Steel Nails 2010-2011*) should be disregarded here, because it is a surrogate value memorandum pertaining to an entirely different proceeding. *See* Def's Br. at 43, referencing 19 U.S.C. § 1516a(b)(2)(A) and *Shandong Huarong Machinery Co. v. United States*, 29 CIT 484, 491 (2005) (recognizing that each administrative review is a separate segment of proceedings with its own unique facts).  Commerce also argues Kangtai's contention is illogical, because a dataset that has been placed in the public record as a publicly available document in a prior review cannot subsequently become "non-public" information, and Kangtai does not cite any record evidence to controvert Commerce's determination that the *Camarines Sur* data is publicly available.

Kangtai responds that Commerce has indicated

an absolute threshold policy that a value source must be actively publicly available, *i.e.*, capable of duplication by Department researchers, to be considered usable. Kangtai is not claiming that the *Camarines Sur* source was never public. However, on the record of this particular segment -- which the United States elsewhere insists must stand alone -- the link was disabled and the source was not available. When this occurred in past cases, the Department specifically ruled that it could not duplicate the source; and hence it was not public or reliable. *See* Kangtai's R.56.2 Br. at 36. This should be the end of the matter because there is another usable source for electricity on the record that the Department previously relied upon.

Kangtai's Reply at 19-20.

On this argument, Kangtai prevails. Kangtai is not asking for consideration of a "fact" that has not been made a part of the administrative record before the court, *see* 19 U.S.C. § 1516a(b)(2)(A), it is asking for consideration of a matter of law, in the form of a prior decision by Commerce on a similar circumstance, and arguing for consistency with that decision. At the very least, Commerce needs to explain why this matter compels a different result on its public availability determination, and remand therefore is appropriate.

2. Representative of a Broad Market

There appears to be no dispute that the Meralco and NPC data provide market coverage that is broader than the *Camarines Sur* data. Commerce found that "both the Meralco and NPC rates provide broader market averages inherent in the larger coverage area than the cities identified in the *Camarines Sur* data." *IDM* cmt. 2.E. at 18. Commerce, however, considered that this factor was outweighed by the other factors, and that the *Camarines Sur* data have "sufficiently broad coverage" to be a surrogate value of the Philippine market.

Kangtai argues Commerce "vastly understates" the *Camarines Sur* data's deficiency and relies upon them in the face of "longstanding and logical" departmental policy that instructs that a source that is not "countrywide" is unlikely to be representative of costs in the surrogate country.

Kangtai highlights that the *Camarines Sur* region is "tiny" and "mostly rural" as compared to the "large industrial regions covered by Meralco" (and NPC).  For this reason, Kangtai argues Meralco (and NPC) are "many times more specific and many times more representative in the coverage of the Philippines."  Kangtai's Reply at 20.

Commerce would probably agree, *see supra*, but the final analysis of reliance upon the *Camarines Sur* data also depended upon the remainder of the five-factor test, discussed below.

3.  Specificity

The production factor that Commerce was valuing is the kilowatt hours of electricity used to make the subject merchandise (chlor-isos).  Commerce observed that the *Camarines Sur* data contained specific industrial electricity rates in kilowatt hours, and are, therefore, specific to the electricity factor.

Regarding the NPC data, Commerce found that they did not contain any industrial rates and are therefore  "inferior to other information available on the record." *IDM* cmt. 2.E. at 18. Additionally, it determined that although the Meralco data contained industrial rates, the data were broken down into more categories than the *Camarines Sur* data. *IDM* cmt. 2.E. at 18. Commerce determined that "there is a meaningful degree of variability in [the Meralco] rates based on the primary and secondary industry classifications assigned to that rate," but that "[n]either respondent company . . . provided an explanation and information to support the industry power classification it should be assigned." *Id*.  Commerce explained that the "use of more precise and specific data such as Meralco requires that [it] have sufficient information on the record to properly assign these rates to the respondent companies due to the variability found in the rates themselves." *Id*.  Because no

evidence existed on the record for Commerce to determine which Meralco rate it should assign to the respondents, Commerce selected the *Camarines Sur* data as the best available information.

Kangtai, first avers that the NPC, not the *Camarines Sur* data, is the "best available" information on the record. Kangtai Br. at 38-39.  In doing so, it does not claim that the NPC data is comparable to the *Camarines Sur* in terms of specificity, instead it argues that the specificity factor should have carried less weight.  *Id.* Once again, however, the court cannot reweigh and substitute its judgment for that of Commerce on this issue.  *See*, *e.g.*, *Bristol Metals*, *supra*, 34 CIT at 484, 703 F. Supp. 2d at 1376 (2010).

Kangtai further contends that Commerce should use the Meralco rate that it assigned to other respondents in *Hardwood Plywood from the PRC*, 78 Fed. Reg. 58273 (Sep. 23, 2013) (final determ. of sales at less than fair value) and *Steel Wire Hangers from the PRC*, 77 Fed. Reg. 66952 (Nov. 8, 2012) (final rev. results), and accompanying I&D Memo at 19.  But, Kangtai does not identify how the facts of those reviews are similar to those in this case.  Commerce's surrogate value determination is based upon the best available information on the record of each review.  Accordingly, Commerce's use of a certain Meralco rate in other reviews has no bearing upon Commerce's determination in this case. *IDM* cmt. 2.E. at 18.

Kangtai also claims that Commerce makes the incongruous argument that because Meralco has several categories of industrial users, it is less specific than the *Camarines Sur* source, which only has one category. Kangtai discussed at length in its moving brief, at pp. 38-39, how the Meralco and NPC (the other source) data are indeed more detailed and specific schedules that cover industrial areas of the Philippines.

Arch augments Kangtai's observation by adding that Commerce contradicts itself. First, it points out Commerce first states that the *Camarines Sur* rate is more specific than the other rates on the record, Def's Resp. at 50, and then in the next paragraph states that Meralco's rates are so specific that they cannot be applied because Commerce didn't know which specific rates to use. *Id.* at 51.  In either event, Arch contends, the Meralco rates are more specific and can be applied to Jiheng. Arch points out that it provided information for Commerce to classify its electrical usage, Arch Br. at 17 (stating that it had identified the correct classification as "GP 115 KV"), and concedes it failed to provide support establishing that it actually fell into that category.  Nonetheless, it claims that Commerce should have accepted its description without support.  *See id.* Alternatively, Arch argues, Commerce could have simply resorted to facts available in deciding which classification applied. On this point, Kangtai contends that Commerce did not request additional electrical usage information from it. Arch Br. at 17, Kangtai Br. at 39.

Commerce requires respondent companies to provide the information necessary to determine surrogate values and Commerce admits that Jiheng provided information on which Meralco classification would apply.  *Id.*  Commerce, however, claims the information was inadequate because Jiheng did not provide evidentiary support to back up this statement. Commerce's determination must be supported by substantial evidence on the record, and it is the respondents' burden to create an adequate record, something in this instance Commerce argues they failed to accomplish.  Def's Resp at 51-52, referencing *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992).  But Commerce apparently accepted Jiheng's statements regarding other factors, such as Filter Aid, without requiring such evidentiary support.  *See* Jiheng's Section D Questionnaire Response, PDoc 67 (Nov. 26, 2012) (Pub. Appx.).

Commerce must be consistent in its application of its evidentiary standards, and there is no evidence on the record otherwise calling Jiheng's statement into question. Commerce therefore, apparently, had what it needed and required, in order to apply Meralco's rates to Jiheng's electricity FOP. Arguably, facts available could also have been derived with respect to Kangtai, as it argues in its briefs.

Having apparently agreed that the Meralco and NPC data provide broader coverage, Commerce does not, on this record, justify resort to the *Camarines Sur* data in light of its contradictory statement, as Kangtai and Arch pointed out, and based on the apparent sufficiency of the data presented by Jiheng. Remand for further explanation or reconsideration is appropriate.

4.  Contemporaneity; Taxes and Duties

Arch argues that it identified the unsupported assumptions made by Commerce in determining to use *Camarines Sur* as the source of its electricity value, contrary to Commerce's declaration that contemporaneity, and taxes and duties are uncontested. Arch's Br. at 15-21. Specifically, Arch argues that Commerce assumed the source was tax and duty free, assumed that a 2009 rate was effective during the 2011-2012 period of review, and assumed that the data was quality data without "unknown variability." Arch points out that "[a]ssumptions are not decisions based on substantial evidence." Arch's Reply at 8. In this instance, that appears to be the case.

Commerce may infer a fact from the record, but it needs to support the validity of the inference by thorough reasoning, which is lacking on this record. Remand for that purpose as well as in accordance with the foregoing is appropriate.

I.  Valuation of Steam

Commerce determined the value for steam in the *Final Results* by rejecting two contemporaneous steam values and selecting instead the GTA import data from the Philippines for natural gas, which it multiplied by a steam conversion factor and inflated to approximate contemporaneous parity with the POR. *IDM* cmt. 2.A. at 11-12. Commerce states this approach was consistent with several prior cases. *See id.*

Arch argues Commerce should have used either the Philippine domestic price quote from "Geothermal Energy Weekly" or the Thai domestic price quote from Glow Energy's 2011 Annual Report in accordance with *Xanthan Gum from the PRC*, 78 Fed. Reg. 2252 (Jan. 10, 2013) (prelim. determ. of sales at less than fair value) and accompanying I&D Memo at 15, and *Certain Activated Carbon from the PRC*, 78 Fed. Reg. 70533 (Nov. 26, 2013) (final rev. results) ("*Activated Carbon*") and accompanying I&D Memo. Arch's Br. at 20-21. Arch contends that Commerce's sole justification for using the import data -- to value all factors in a single surrogate country -- has again led to the selection of information that is not the best available and is an improper result because Commerce has improperly ignored the product specificity and contemporaneity of the data in selecting the surrogate value for steam. *See id.* at 21-22, referencing *Camau Frozen Seafood*, *supra*, 37 CIT at ___, 929 F. Supp. 2d at 1355-56 (noting that Commerce has the statutory authority to use multiple surrogate countries, and stating that "it is not sufficient for Commerce to cite the policy of using a single surrogate country where, as here, there is reason to believe that the primary surrogate country may not provide the best available information for a particular FOP").

Commerce agreed that the Geothermal Energy Weekly quote and the Glow Energy 2011 Annual Report price were product-specific, publicly available, and contemporaneous with the POR, but it maintains that the record lacked actual information from the website providing the

Geothermal Energy Weekly quote that supports the proposed conversion factor used to calculate the value of steam on a per metric ton basis, and it maintains it that did not choose the Glow Energy datum because Thailand was not the primary surrogate country and that *Xanthan Gum from the PRC* and *Activated Carbon* are distinguishable because the preliminary record of those proceedings did not contain any data for the Philippines, unlike the matter here.

The laws governing physics apply to Commerce's determinations. *Cf., e.g., Activated Carbon,* 78 Fed. Reg. 70533 and accompanying I&D Memo at cmt. 9, n.192 ("natural gas and steam have the same British Thermal Unit content"). Arch used coal for steam generation and submitted surrogate values for coal. *See* Jiheng's Section D Questionnaire Response, at D-26. The papers before the court do not indicate the type of coal Jiheng used in that generation (*e.g.*, anthracite, bituminous, sub-bituminous), which also governs the applicable conversion factor, and the court was unable to access the precise webpage indicated in Tab 4 of Jiheng's Final SV submission. PDoc 161.

Even if Commerce could have, at the time in question, just as readily attempted similar inquiry,[42] because the court at this point is unable to examine (through pursuit of Arch's

---

[42] *Cf., e.g., Altmeyer v. HHS*, 2013 WL 5316926 *1 & n.4 ("Petitioner did not submit a copy of Dr. Schwartz's curriculum vitae" but "[a]ccording to Dr. Schwartz's practice webpage, he has over twenty years of experience" *et cetera*). *But cf. also NEC Solutions (America), Inc. v. United States*, 411 F.3d 1340, 1346 (Fed. Cir. 2005) ("the bureaucratic difficulty of conveying Commerce's intent is irrelevant[; r]ather, the relevant inquiry is whether Customs would or could have reasonably comprehended the e-mail as being unambiguous") *with U.H.F.C. Co. v. United States*, 916 F.2d 689, 701 (Fed. Cir. 1990) ("whether . . . due to a legally erroneous interpretation of the regulation by the staff at the time or simply bureaucratic rigidity is immaterial . . . [t]he record consistently demonstrates that the only basis for ITA's decision to deny price adjustments was the failure of the manufacturers to supply cost of production information for individual grades which would establish that higher grades cost more to produce", but "[t]he government's reference to one instance where 300 bloomgram strength glue was sold during the review period for a lower price than an identical quantity of 210 bloomgram strength glue is comparable to finding one bad apple and concluding all
(continued...)

reference point) the conversion factor Arch claimed in its administrative submission, that circumstance in itself speaks volumes about the reasonableness of requiring hard copies of all information submitted for the record for Commerce's (and the public's) view.  The burden is on the interested party to place relevant information on the record.  Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994) ("SAA") at 829.  *See supra* (Electricity -- Public Availability); *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012) (discussing circumstances when supplementation of record may be ordered).

As for the objective of maintaining consistency across proceedings, the court is unable to conclude that Commerce's explanations are unreasonable.  Arch complains that Commerce chose to use a less specific, non-contemporary value for natural gas and apply a conversion factor that was on the record but for which no support existed on the record, although it had been used in another case (*see* Prelim. Results SV Memo at 6 and Appx. III.47), and Arch also argues it is contrary to reason to reject an otherwise better potential surrogate value due to a flaw that also exists with the surrogate value selected, but the court cannot reweigh the evidence, and Commerce's choice appears consistent with prior determinations, all other things being equal.

Arch's arguments therefore do not demonstrate that Commerce's surrogate valuation of steam was unreasonable.

### J.  By-Product Offset

#### 1.  Further Background

---

[42] (...continued)
in the bushel are spoiled").

The antidumping statute does not mention (let alone address) the treatment of by-products generated during production of the primary product, and no regulation addresses that "gap." *See, e.g., Guangdong Chemicals Import and Export Corp. v. United States*, 30 CIT 1412, 1422, 460 F. Supp. 2d 1365, 1373 (2006). Commerce's general practice has been to grant an offset for by products generated during the production of subject merchandise, provided the respondent could demonstrate that the by-product has commercial value by being either resold or re-entered into the respondent's production process. *See, e.g., Arch Chemicals, Inc. v. United States*, 33 CIT 954, 959 (2009).

In the original investigation and in the first through the fifth administrative review segments of the antidumping duty order, Commerce had acknowledged by-product offset claims for the intermediate products ammonia gas and sulfuric acid, which are reacted to produce ammonium sulfate. More precisely, for those proceedings Commerce acknowledged that its "downstream by-products practice" for determining by-product credits did not apply to the process of subject merchandise production, and that ammonium gas and sulfuric acid were the relevant by-products at the "split-off" point in the production of subject merchandise. *See, e.g., Clearon II*, 39 CIT at ___, Slip Op. 15-91 at 46-47.

For its *Final Results*, however, and as "tee-ed up" by its discussion of the issue in the prior *Sixth Review*, Commerce, essentially reversed itself (but without so stating) by finding that ammonium sulfate, a downstream by-product, is the relevant by-product for purposes of the respondents' by-product offset claims. *See IDM*, cmt 5.B. at 30. This is revealed by returning to the previous *Sixth Review*. Between the preliminary and final determinations thereof, Commerce announced that it was changing the manner in which it calculates the by-product offsets for both

Jiheng and Kangtai in order "to conform to the Department's recent practice." *Sixth Review* I&D

Memo at 23.   Commerce claimed that the new methodology was "consistent with the information

the Department requests in our questionnaire, which asks respondents: "[i]f the byproduct for which

you are claiming an offset is a downstream by-product, in addition to responding to the items above,

please also: (i) Provide the per-unit usage rate of each input used to produce the downstream

by-product." *Id.* (quotation source omitted).   On appeal to the court, Commerce requested voluntary

remand to address the interested party comments that it had not addressed, which was granted.   The

*Clearon Redetermination* for the *Sixth Review* then provided further explanation:

> In past reviews of this order and in the Preliminary Results, we determined Jiheng's
> and Kangtai's by-products of ammonia gas and sulfuric acid by starting with the
> amount of ammonium sulfate and calculating the amount of the two by-products
> chemically required to produce that amount of ammonium sulfate. We then applied
> SV's for ammonia gas and sulfuric acid to the two by-products. We stated in the
> *Chloro Isos 6th Final Results* that, at that time, we were "adjusting the manner in
> which we calculate the by-product offsets for both Jiheng and Kangtai to conform
> to the Department's recent practice."[ ] *We stated that it was still the Department's
> practice to first start with the value of the downstream product (i.e., ammonium
> sulfate) that was actually sold by the respondents and produced during the POR.*  In
> a departure from our previous method in this case, we sought to deduct any costs
> associated with converting *the by-product* into the downstream product, such as labor
> and electricity, using an FOP and SV cost methodology.   For the *Chloro Isos 6th
> Final Results*, we did not have the FOPs to deduct, so we used the full value of the
> ammonium sulfate as the full value of the two by-products combined as the
> by-product offset.[ ]   We modified the methodology we used in the *Chloro Isos 6th
> Final Results* to avoid overstating the value of the by-product offsets and . . . to bring
> the calculation into conformity with agency-wide policy.   *To do this, we must grant
> an offset equal to the amount of value a company actually receives*, less any
> processing costs, and not a hypothetical value that is unrelated to a company's
> financial books and records.[   ]   It is clear from the underlying review that
> ammonium sulfate is the product actually sold by the companies.[ ]   Reviews under
> separate orders provide examples of the policy employed in this underlying review:
>
>> As citric acid and dry high protein scrap are the saleable products that
>> result closest to the split-off point, we started with SVs from the
>> selected surrogate country[ ] for these products, then reduced the

values by the cost of further processing each product after the split-off point. The further processing costs were calculated based on RZBC's reported FOPs after the split-off point and the respective SVs from the selected surrogate country for each FOP.  This analysis demonstrated that the net realizable value (NRV) of high protein scrap at the split-off point is significant as compared to that of the liquefied liquid.[  ]

In other words, *to derive the NRV of each by-product, the Department obtains a reasonable market value for each by-product, as close to the split-off point as possible*.  To do so, the Department starts with the value of the saleable products that result closest to the split-off point and then reduces this value by the cost of further processing each by-product after the split-off point. For the *Chloro Isos 6th Final Results*, we did not elaborate on this methodological change for the final results, or why we felt it was warranted, given the record facts.[  ]  However, this policy is evident from our boilerplate questionnaire, used in the underlying review, which asks parties to report the FOPs required to process the by-products into the saleable downstream product.[  ]

*Clearon Redetermination*, Court No. 13-00073*, at 28-30 (citations omitted; italics added in part).[43]

In contrast to the foregoing, for the *Final Results* of the proceeding at bar Commerce addressed the by-product offset issues as follows:

For these final results, the Department is *continuing* to treat ammonium sulfate as *the by-product*.  As explained in the previous review, "the Department first starts with the value of the downstream product actually sold by the respondents, ammonium sulfate, produced during the POR . . . [f]rom this amount, the Department would normally deduct the costs associated with converting *the by-products* into *the downstream product*, such as labor and electricity."[ ] As Petitioners accurately explain, it is the Department's well-established practice that the mere production of by-products, such as ammonia gas and sulfuric acid, is not sufficient to grant an offset. Indeed, the by-product must have *commercial sales* and revenue must be realized from these sales in the corporate accounts.[  ]  Record evidence does not

---

[43]   Those results go on to explain that Commerce has "specifically requested this cost information in other cases where parties did not provide the details in their initial questionnaire response" but because of the timing of the results for the *Sixth Review* Commerce did not have an opportunity to follow up and request from the parties the information it claims it required. Commerce was subsequently able to obtain the information it sought through voluntary remand of *Clearon*.

show that Jiheng sells either *ammonia gas or sulfuric acid*.  Indeed, these products are used to make and sell ammonium sulfate.[  ]  In order to receive an offset, a respondent must demonstrate that there were actual sales of *the by-product*.[  ] Jiheng has demonstrated that it sells ammonium sulfate, the downstream by-product. As a result, the Department is granting an offset for Jiheng in these final results.

The record evidence for these final results does not support granting a by-product offset to Kangtai.  In order to grant an offset, income from the by-product must be realized by the company (*i.e.*, it must be recorded in that company's accounting records).[  ]  Kangtai argues that the Department fully confirmed and verified that Kangtai sold ammonium sulfate and realized revenue from its sales.[  ]  Additionally, Kangtai noted that because it did book the income realized from the sales of by-product in the normal business of operation, and the Department fully verified that the payment was actually received by the company's financial department, it is entitled to an offset.  This claim is not supported by the record and the Department's strict definition that in order to be "realized," income must be recorded in the company's accounting records.  Furthermore, the Department found at verification that "[b]eyond the warehouse journal, Kangtai does not maintain an inventory account for ammonium sulfate in its accounting system, nor do they have an inventory control process established for this by-product."[   ]   Therefore, the Department finds that Kangtai is not entitled to an offset.

Petitioners further argue that Kangtai did not provide the per-unit usage rate of each input used to produce that ammonium sulfate, and should not be granted an offset because the Department does not have the information necessary to make the proper adjustments.  As the Department is not granting a by-product offset to Kangtai, this argument is moot.

However, the Department notes that while Petitioners are correct in stating that Kangtai did not provide any per-unit usage rates, an exhaustive review of the ammonium sulfate production process during verification supports Kangtai's claim that these costs are included in the production of cyanuric acid, and that there is no accurate way to separate the costs associated with the production of ammonium sulfate from the cyanuric acid production costs.[  ]

*IDM* cmt. 5.B. at 30-31.

Numerous problems have been created by the alteration of the previous methodology.

In addition to those identified in *Clearon II*, others are identified below.

### 1.  Neither the New Methodology Nor the Reason For the Change Is Understandable

In *Clearon II*, it was unclear to the court what had transpired regarding Commerce's by-products methodology with respect to the respondents' by-product offset claims.  *See Clearon II*, 39 CIT at ___, Slip Op. 15-91 at 55-60.  Commerce's indication, *see id.*, was that its change to its by-products methodology only amounted to a minor "tweaking" thereof, but it appears Commerce not only moved the goal-posts for the matter at bar, but did so radically, since the quoted passage of the *IDM*, above, indicates a further "evolution" of policy as applied in this matter, to the extent that Commerce has now announced that the relevant by-product is, in fact, ammonium sulfate, in contrast to its previous consideration in the investigation and the first through the fifth administrative reviews that ammonia gas and sulfuric acid were the relevant by-products.  In addition, not only is Commerce now requiring books and records of actual commercial *sales* of the downstream by-product and actual realization of revenue from these sales in the corporate accounts (in contrast to commercial *value*), it is now limiting the offset according to the "value" of the actual sales of such downstream by-product, or so the *IDM* appears to state.[44]

As a preliminary matter, because the explanation in the *IDM* is confusing as to what the relevant by-product(s) is/are for purposes of accounting for (or "granting") a by-product offset (*i.e.*, whether it is ammonium sulfate or are ammonia gas and sulfuric acid; *see IDM*, quoted *supra*), during consideration of *Clearon II* and also for the purpose of this matter, the court asked for additional briefing to clarify what Kangtai and Arch have been claiming as by-product offsets in the

---

[44]  *See IDM* cmt. 5.B. at 30 & n.101, relying on *Lined Paper from the PRC*, 71 Fed. Reg. 53079 (Sep. 8, 2006) (notice of final determ. of sales at less than fair value) and accompanying I&D Memo at cmt. 11, in turn relying on *Non-Malleable Cast Iron Pipe Fittings from the PRC*, 68 Fed. Reg. 7765 (Feb. 18, 2003) (notice of final determ. of sales at less than fair value) and accompanying I&D Memo at cmt. 3.

*Sixth Review* and in this *Seventh Review*.   *See* Consol. Court No. 13-00073, ECF No. 89 (May 8, 2015).   The government confirmed that Kangtai and Jiheng "made the same" claims in the *Sixth Review* and "made essentially the same by-product offset claims to recover offset amounts for ammonia gas and sulfuric acid, but with different factual circumstances pertinent to their respective positions" for this *Seventh Review*.   Consol. Ct. No. 13-00073, ECF No. 92 (May 22, 2015) at 5.

        With that in mind, after considering the *IDM* and the arguments on the issues, the court must conclude that Commerce in the *IDM* does not adequately "explain its departure from prior norms", *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 808 (1973), nor does Commerce present a "rational connection between the facts found and the choice made", *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

        Commerce's rationale for its change in methodology still does not make sense, *cf. Clearon II*, 39 CIT at ___, Slip Op. 15-91 at 55-60, despite appeals to "agency-wide practice" and "accounting principles" and so forth, *see id*.   It remains unclear, for example, whether Commerce has entirely abandoned its previous policy of granting an offset for a by-product if its commercial value is demonstrated, *e.g.*, through sales or reintroduction into production, and if so why.   No rational explanation has been provided therefor beyond the conclusory statement that this produces "accuracy".

        It also remains unclear, in accordance with generally accepted accounting principles governing co- and by-product cost accounting, why a company must "realize" an actual sale from a downstream by-product before an offset claim pertaining to an intermediary by-product's value that has been generated during the production of subject merchandise will be recognized.   Once the good is produced, arm's length transaction(s) in it would certainly provide monetized indication of

its "value" for accounting purposes, but that is not the only recognized reasonable method of establishing its value.  Simply put, if value is demonstrated, then it is entitled to cost allocation for accounting purposes, which is not an exact science.  By contrast, accounting for the by-product's disposition, profit and loss are separate (but related) matters.

At a minimum, even taking into account Commerce's explanation in the *Clearon Redetermination*, *supra*, the matter before this court needs to be remanded for a clearer explanation of why Commerce has altered its methodology, which in the past simply relied upon the surrogate values of record for each of the relevant products (ammonia gas, sulfuric acid, and ammonium sulfate)  and explanation of how, precisely, the much more complicated new methodology is an improvement over the old.

## 2.  Denial of By-Product Offset for Kangtai

During verification of Kangtai, Commerce did not find any revenue from sales of ammonium sulfate in Kangtai's general ledgers and financial statements but it did verify that Kangtai maintained a warehouse inventory ledger for that by-product.   In the *Sixth Review*, Commerce had granted a byproduct offset to Kangtai without conducting verification to determine if the by-product sales were recorded in Kangtai's accounting records.  *See Clearon II*, 39 CIT at ___, Slip Op. 15-91 at 50.  For this *Seventh Review*, however, Commerce faulted Kangtai, *post facto*, for "not maintain[ing] an inventory account for ammonium sulfate in its accounting system, nor do[es Kangtai] . . . have an inventory control process established for this by-product." *IDM* cmt. 5.B. at 30.  *See also* Verification Report for Kangtai, PDoc 176 (Nov. 18, 2013) at 32-33.

Commerce had verified detailed records maintained by Kangtai that document the production, sale, and collection of revenue for Kangtai's sales of ammonium sulfate contained in

its company ledgers or warehouse journal and that the company had received payment for those sales. *See* Kangtai's Br. at 43-44 and cited references. Based on the policies existent when Kangtai made its sales and maintained its records in this period of review, the amount of Kangtai's intermediate inputs (ammonia gas and sulfuric acid) generated during the production of subject merchandise therefore had commercial value, thus providing a basis for the by-product offset. Fundamentally, then, the "final" new requirement of the matter at bar is that the by-product revenue for the downstream by-product must be booked a particular way.

Commerce expressed concerns about the booking of sales of the downstream by-product.[45] Kangtai complains that Commerce's briefing only makes the conclusory statement that the producer does not sell the immediate by-products on the market, so therefore using Commerce's previous by-product valuation methodology would be distortive, and that Commerce has not explained why this results in distortion nor does Commerce cite any record evidence in support of this conclusion.

The court needs further clarification from Commerce on this point. On the one hand, it appears as if Commerce has decided that the ultimate disposition of a co- or by-product that is identified at the split-off point is what is indicative of its "value," to the company, and is what grounds that value in reality and not in the abstract (whether sold, discarded, re-entered into production, or what-not). If such a new by-products valuation methodology is valid -- which is not settled -- then it would not appear inappropriate to require precise documentation of how the downstream by-product has been transacted, which would establish its value to the company. In the

---

[45] *Cf.* Kangtai's Br. (conf.) at 43-44 (re: handling of remuneration).

absence of proper bookkeeping that documents such by-products' disposition and remuneration to the company therefor, it is understandable that Commerce would pause before concluding that such disposition was a commercial or corporate transaction or distribution, insofar as the company itself was concerned.

On the other hand, if Commerce is here denying what would appear to be an otherwise appropriate joint-cost allocation to the non-subject merchandise in defiance of its verification of Kangtai that proved that ammonia gas and sulfuric acid by-products were generated during the production of subject merchandise (as indicated by the respondents' evidence thereof at verification), then Commerce is effectively using the subject merchandise to bear the cost of its concern regarding the disposition of Kangtai's ammonium sulfate. A company's disposition of its by-product is not the only recognized method for accounting purposes of establishing value, which Commerce's prior by-products offset methodology recognized, and the disposition of by-product is not, necessarily, indicative of the carrying value of product that remains in inventory. Stated differently: simply because certain product is not "transacted" at arm's length does not mean that inventoried by-products generated during the production of subject merchandise do not have commercial value.

Kangtai argues here that Commerce verified that it transacted and received remuneration for ammonium sulfate as recorded in the company ledgers or warehouse journal. *See* Kangtai's Br. (conf.) at 43-44 and cited references. Kangtai also complains of a lack of opportunity to cure or address the consequences of Commerce's new policy. The court is inclined to agree that Kangtai had a right to anticipate that it could rely on Commerce's then-existing by-products offset practice at the time of its sales of the downstream by-product. Commerce has also apparently

avoided Kangtai's arguments that there were options on the record to avoid the complete (and, Kangtai claims, "catastrophic") denial of any offset, and that any distortion potentially caused by the manner in which Kangtai booked by-product revenue is entirely addressed by the NME methodology. *See* Kangtai's Br. at 45-46. Kangtai argues by analogy to market economy cases in which Commerce has adjusted a respondent's figures rather than completely disregard reality; *e.g.*, when a respondent receives interest free shareholder loans, Commerce, has resorted to a "facts available" market interest cost to add to the respondent's constructed value rather than pretending these loans do not exist. *See, e.g., Stainless Steel Bar From India: Notice of Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 52294 (Sept. 9, 2008), and accompanying I&D Memo at cmt. 7. Similarly here, Kangtai argues, Commerce could have added the surrogate value to booked revenue.[46] In any event, Kangtai continues, the use of surrogate financial statements precisely addressed any such potential distortions.

Be that as it may, it is up to Commerce to revisit Kangtai's contentions on remand in accordance with the foregoing.

### 3. By-Product Offset for Arch

Commerce granted Arch a by-product offset for the ammonia gas and sulfuric acid generated in the production of subject merchandise by calculating the by-product adjustment using a surrogate value for the downstream by-product ammonium sulfate, the actual downstream product sold by Jiheng. *See IDM* cmt. 5.B. at 30. From the selected surrogate value for ammonium sulfate,

---

[46]  *I.e.*, Kangtai not-unreasonably argues that if Commerce insists on costing an unbooked cost, then Commerce must recognize an unbooked but documented revenue in order to be consistent.
.

Commerce subtracted Arch's "surrogate value" costs associated with transforming the ammonia gas and sulfuric acid into ammonium sulfate, resulting in a calculation of the "actual" value Arch received for the ammonia gas and sulfuric acid by-products.

a.  Ammonium Sulfate versus Ammonia Gas and Sulfuric Acid Offset

As in the *Sixth Review*, Arch here also contests Commerce's determination that ammonium sulfate was the correct by-product upon which to base the offset instead of basing it directly upon ammonia gas and sulfuric acid surrogate values.  Commerce states that its

> decision to use a value for ammonium sulfate to calculate the by-product offset amount represents the best available information and establishes Arch's antidumping duty margin as accurately as possible because it *reflects Arch's actual business experience*. Indeed, the very purpose of Commerce's factors of production methodology is to calculate an amount that reflects the production and sales experience of the non-market economy producer valued in a surrogate market economy country. *See* 19 U.S.C. § 1677b(c).

Def's Resp. at 63-64 (italics added).  Commerce's position here is quite at odds with its position on choosing appropriate surrogate values for chlorine and hydrogen gas, *see supra*, among others.  At any rate, as an initial matter Arch points out that Commerce's "distortion" theory amounts to *post hoc* rationalization[47] and that even if Commerce had claimed that non-sales of ammonia gas and

---

[47]  *Post hoc* rationalization is not part of the original determination, and agency action may only be upheld, if at all, on the grounds that the record shows were the articulated grounds.  *See*, *e.g.*, *Chenery*, *supra*, 318 U.S. at 87. Commerce never determined, as argued here, that it "determined that in using ammonia gas and sulfuric acid values to make an adjustment to normal values, the by-product offset was *distorted* because [Jiheng] did not actually sell these products in
(continued...)

sulfuric acid is distortive, Commerce fails to explain how or why it was distortive or why it was not

distortive in the investigation and five subsequent reviews.

Echoing Kangtai, Arch's overarching argument is that Commerce never reasonably

explained why it was no longer treating ammonia gas and sulfuric acid as the relevant by-products

and instead switched to the downstream ammonium sulfate, and that the result is contrary to

Commerce's long-standing practice both in this case and in general with respect to downstream

by-products.  Commerce has described its normal by-product offset practice as "limited to the total

production quantity of the by-product . . . produced during the POR, so long as it is shown that the

byproduct has commercial value."[48]  As above indicated, neither the *IDM* nor  Commerce's first

*Final Results of Redetermination* for the *Sixth Review* provide adequate explanation on what the new

methodology actually is, why it is needed, and how it results in improvement over the old

methodology.  In accordance with *Clearon II* and the foregoing, this issue is being remanded, and

the court need not, therefore, address the remainder of Arch's arguments thereon as expressed in its

briefing.

      b.  Selection of Surrogate Value for Ammonium Sulfate By-Product

Arch also contests Commerce's decision to use imported ammonium sulfate values

instead of domestic values.  In the *Final Results*, Commerce used GTA import data from the

---

[47] (...continued)
their raw form", Def's Resp. at 63 (italics added), but determined in the *IDM* as quoted above.

[48] *See, e.g., Frontseating Service Valves From the PRC: Final Results of Antidumping Duty Administrative Review; 2008-2010*, 76 Fed. Reg. 70706 (Nov. 15, 2011) (final rev. results) and accompanying I&D Memo at cmt 18; *Multilayered Wood Flooring From the PRC: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64318 (Oct. 18, 2011) (final determ. of sales at less than fair value).

Philippines to value ammonium sulfate, which Commerce used as a by-product offset for Arch. *IDM* cmt. 2.C. at 14.  Citing Commerce's preference to use domestic prices rather than imported prices, Arch contends that Commerce should have used the domestic retail price of ammonium sulfate as reported by the Philippine Government's Fertilizer and Pest Authority to value ammonium sulfate. Arch's Br. at 27-28.

  Commerce here states that when it decides whether to use domestic or import prices of the primary surrogate country, it examines the facts of the case regarding the surrogate country purchaser's actual experience.  Def's Resp. at 58, referencing *Rhodia*, *supra*, 25 CIT at 1286-87, 185 F. Supp. 2d at 1351-52 (stating that because the "the purpose of the statute [is] to construct the product's normal value as it would have been if the NME country were a market economy country", the preference in favor of using domestic data does not require that domestic data be used in circumstances where it would conflict with the goal of accuracy).

  Commerce first states that it properly declined to use the domestic retail price for ammonium sulfate because Arch failed to provide any evidence or argument to establish that Philippine producers rely primarily on domestic sources of ammonium sulfate to produce comparable merchandise.  *IDM* cmt. 2.C. at 14.  Commerce states that it found that there were significant amounts of ammonium sulfate imported into the Philippines, thereby demonstrating a commercial demand for this product.  *See id.*  This rationale is flawed for at least two reasons: (1) Arch is a U.S. importer of subject merchandise, not a producer (Jiheng is the producer of subject merchandise), and (2) more importantly, ammonium sulfate is considered a by-product of the

production process, not an input; ammonium sulfate is not used to produce comparable merchandise or subject merchandise, regardless of whether it is imported or produced domestically.[49]

Commerce also states that it determined that the Philippine Fertilizer and Pesticide Authority reported prices of ammonium sulfate based on 50 kilogram bags but without sufficient record evidence to conclude that Arch sold its ammonium sulfate in retail quantities to similar customers. *Id.* Commerce criticizes Arch's citation to Kangtai's verification report which states that Kangtai packs its ammonium sulfate in 50 kilogram bags, *see* Arch's Br. at 28, as irrrelevant to whether Arch sells ammonium sulfate in those retail quantities. In *Clearon Corp. v. United States*, 35 CIT ___, Slip Op. 11-142 (2011) at 9-14, the court rejected that specific argument before with respect to this very data source, although urea was the product at issue, not ammonium sulfate, finding that Commerce had not provided any reason to conclude that the packaging of the product is a material consideration, and remanding the decision back to Commerce with instructions to explain why this was a relevant consideration. Upon remand, Commerce found, as noted by the court, that because one of the two respondents purchased the urea in 50 kilogram bags, "Commerce has now concluded that neither market segmentation nor that the Philippine urea was sold in fifty-kilogram bags presents an obstacle to the use of Philippine prices." *Clearon Corp. v. United States*, 37 CIT ___, Slip Op. 13-22 at 7 (Feb. 20, 2013). Commerce here does not explain why the packaging was relevant, nor does it explain why the fact that there was evidence that at least one of

---

[49] Arch also argues there is evidence on the record that Jiheng sold its ammonium sulfate domestically. *See*, *e.g.*, Jiheng's Section D Questionnaire Response, at Ex. D-12.3 (invoice of sale of ammonium sulfate to a Chinese purchaser), CDoc 69; Verification of the Sales and Factors Response of Jiheng, PDoc 89 (Nov. 20, 2012), at 33. Arch does not explain, however, what this has to do with Commerce's argument.

the producers sold the ammonium sulfate in 50 kilogram bags was insufficient if packaging was

relevant.  Commerce states that it was unable to "confirm" that Kangtai actually made any sales of

ammonium sulfate during the period of review ("[t]his claim is not supported by . . . the

Department's strict definition"), *IDM* cmt. 5.B. at 30-31, but that appears to be of little relevance

as far as Commerce's verification of Kangtai's packaging and Arch's contention is concerned.

Commerce states that it was also unable to discern whether the prices included by the

Philippine Fertilizer and Pesticide Authority were tax exclusive, *see id.*, cmt. 2 at 14, and it

acknowledges Arch's contention that Commerce had previously found the Philippine Fertilizer and

Pesticide Authority prices for urea to be acceptable and tax and duty free and that Commerce had

not distinguished between types of customer, Arch's Br. at 27, but Commerce contends Arch never

raised these arguments during the administrative proceedings and is therefore barred by failure to

exhaust.  Commerce also contends that its findings with respect to this data source for an entirely

different input are inconsequential in any event.

The court has no way of evaluating inconsequentiality at this juncture, but it finds

exhaustion inapplicable here for two reasons.

First, the relevant data were not on the record in the preliminary proceeding;

therefore, the first opportunity to argue for these data's use arose in the case brief, where Arch so

argued.  *See* Arch's Case Br., PDoc 180, at 16-18.  Since Arch had no way of knowing that

Commerce would ignore its previous finding with respect to this data source, Arch  had no reason

to argue that Commerce should uphold its previous acceptance of this source.  Arch is not required

to anticipate that Commerce will act contrary to its previous practice, and exhaustion does not apply

if the first opportunity to raise the issue arises as the result of the final results of the review.  *E.g.,*

*Dupont Teijin Films China Ltd. v. United States*, 38 CIT ___, ___ n.6, 7 F. Supp. 3d 1338, 1348, n.6 (2014) (exhaustion doctrine does not apply where issue was largely irrelevant until Commerce changed methodology in the final results).

Second, the fact that Commerce had previously found this data source to be acceptable is an extension of the argument raised in Arch's case brief that this data source provides the best available information with which to value ammonium sulfate. It is not a separate argument. The exhaustion doctrine does not prevent a plaintiff from expanding on an argument based on the final record before the court, and an argument raised below does not need to be worded exactly as it is to the court.[50] The fact that Commerce had previously approved this data source for urea, until it was demonstrated that there was no domestic production of urea, was discussed at length at the hearing; therefore, Commerce was on notice, the issue was thoroughly discussed, and Commerce had a chance to consider the issue. *See*, *e.g.,* Hearing Transcript, PDoc 199, at 36 and 117.

Arch argues that Commerce has failed to demonstrate that it chose the best available information with which to value ammonium sulfate in light of its preference for domestic prices over imported prices, all else being equal. At any rate, the matter wil be remanded for reconsideration in accordance with the foregoing.

---

[50] *See*, *e.g.*, *Trust Chem*, *supra*, 35 CIT at ___, n.27, 791 F. Supp. 2d at 1268 n.27 ("The determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation. . . . The specific information upon which Plaintiff relies, having been submitted by the Petitioners, is necessarily before the agency."); *Solvay Solexis SpA. v. United States*, 33 CIT 1179, 1183 n.2, 637 F. Supp. 2d 1306, 1309 n.2 (2009) (noting that because Solvay had raised the issue of whether the unaudited statutory financial statement represented the most accurate cost, it was not precluded from arguing on appeal that the problem with the financial statement was how the goodwill was attributed; therefore, the goodwill argument was an extension of the same issue as was raised before Commerce).

### K.  Deduction of Value Added Taxes (VAT) from U.S. Price

In the *Final Results*, Commerce reduced the United States sales prices calculated for Kangtai and Arch by 8% to account for the un-refunded portion of a 9% rebate of the 17% in value added taxes (VAT) the PRC had imposed on certain of those companies' imported inputs.  *IDM* cmt. 5.A. at 28.  Noting Kangtai's and Arch's arguments that Commerce did not address their arguments concerning this issue during the administrative proceeding,[51] Commerce requests voluntary remand to consider and address their arguments in the first instance.

Kangtai and Arch oppose in part, arguing that the court should rule on the merits of their claims at this juncture as a *Chevron* step one problem of statutory interpretation.  Kangtai's Br. at 38-43, discussing *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930*, as amended in *Certain Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36481, 36483 (June 19, 2012); Arch's Reply at 16-17, referencing, *inter alia*, *SKF USA, Inc. v. United States*, 254 F. 3d 1022 (Fed. Cir. 2001) ("*SKF*") (discussing circumstances under which granting a request for a voluntary remand is appropriate and noting that a court has discretion when there is a *Chevron* step one issue).  *See* 19 U.S.C. §1677a(c)(2)(B) (*inter alia*, the U.S. price "shall be . . . reduced by . . . the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States").

The court declines to consider whether the statutory language is a *Chevron* step one issue at this time, as exhaustion compels that Commerce should have first crack at the problem.  *See*

---

[51]  Kangtai's Br. at 39-43; Arch's Br. at 10-16.

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).  Only in a technical sense has there been joinder on this issue (due to the peculiar nature of appeal and briefing of 28 U.S.C. §1581(c) cases before the court), but the full merits, including the agency's direct response to the respondent's arguments, regardless of whether the problem is indeed a *Chevron* step one problem, have not been administratively developed.  Commerce on remand has the latitude to adopt a contrary position without the court's interference, for example, thus mooting the plaintiff's and intervenor-plaintiff's concerns,  Commerce's motion for voluntary remand of this issue is therefore granted.

IV.  *Conclusion*

For the above reasons, the matter must be remanded for further proceedings not inconsistent with this opinion.  The results of remand shall be due December 21, 2015, whereupon by the fifth business day thereafter the parties shall file a joint status report as to comments, if any, on the remand results.

**So ordered.**

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: August 21, 2015
        New York, New York